Rahn D. JACKSON, et al., Plaintiffs,

v.

MICROSOFT CORP., Defendant.

No. C01–775P.

United States District Court,
W.D. Washington,
at Seattle.

Feb. 11, 2002.

Edith J. Benay, San Francisco, CA, Roblin John Williamson, Williamson & Williams, Seattle, WA, Oscar Edward Desper, III, Harrell, Desper, Connell & Roesch, Reba Weiss, Seattle, WA, Dana Walker Tucker, Laura L. Mall, Tricia Purks Hoffler, Willie E. Gary, Gary Williams Parenti Finney Lewis McManus Watson & Sperando, Stuart, FL, Roy J. Bucholtz, Bucholtz & Culbertson, Reston, VA, James Pipkins, Chima Echeruo, Bellevue, WA, for plaintiffs.

Kirk A. Dublin, Preston, Gates & Ellis, Seattle, WA, Richard H. Sauer, Redmond, WA, Neal M. Janey, George C. Doub, Raymond M. Brown, William H. Murphy, III, William H. Murphy, Jr., James E. McCollum, Jr., Carla M. Mathers, William Murphy & Associates, Baltimore, MD, Nancy L. Abell, Patricia M. Berry, Paul, Hastings, Janofsky & Walker, LLP, Los Angeles, CA, Donna M. Mezias, Preston, Gates & Ellis LLP, San Francisco, CA, for defendant.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS, DENYING DEFENDANT'S MOTION TO STRIKE, AND DENYING PLAINTIFF'S MOTIONS TO STRIKE**

PECHMAN, District Judge.

This matter comes before the Court on several related motions. Defendant has brought a motion to dismiss with prejudice the claims of Rahn Jackson. Dkt. No. 65. Defendant has moved to strike a declaration

submitted by Mr. Jackson in opposition to defendant's motion to dismiss (hereinafter "defendant's motion to strike declaration"). Dkt. No. 92. Plaintiff has brought a motion to strike defendant's answer and affirmative defenses, as well as defendant's motion to dismiss (hereinafter "plaintiff's motion to strike answer"). Dkt. No. 126. Plaintiff has also brought a motion to strike portions of the materials filed by defendant in response to plaintiff's motion to strike answer (hereinafter "plaintiff's motion to strike opposition"). Dkt. No. 145.

The Court has reviewed all materials submitted by the parties. In addition, the Court has conducted two evidentiary hearings. Having considered all of the evidence and arguments presented, the Court ORDERS as follows:

- Defendant's motion to dismiss (Dkt. No. 65) is GRANTED. The Court finds that Mr. Jackson has unlawfully obtained proprietary materials from Microsoft and has perpetrated a lengthy series of elaborate misrepresentations and lies to both the Court and counsel. Having considered the prejudice caused by Mr. Jackson to defendant and to the Court, having considered and rejected less drastic sanctions, and having drawn the requisite negative inferences from Mr. Jackson's invocation of his Fifth Amendment privilege, the Court concludes that dismissal of this matter is the only appropriate remedy.

- Defendant's motion to strike declaration (Dkt. No. 92) is MOOT and is STRICKEN. On December 13, 2001, defendant offered into evidence the same declaration which is the subject of this motion.

- Plaintiff's motion to strike answer (Dkt. No. 126) is DENIED. Plaintiff's motion arises from allegations that counsel for defendant made misrepresentations to the Court during the first of two evidentiary hearings held regarding defendant's motion to dismiss. While the Court agrees that counsel's comments were inappropriate and somewhat misleading, they do not rise to the level of sanctionable conduct.

- Plaintiff's motion to strike opposition (Dkt. No. 145) is DENIED.

## FACTS

Plaintiff Jackson is a former employee of Defendant Microsoft Corporation ("Microsoft"). Mr. Jackson left his position at Microsoft on September 29, 2000. Transcript of Deposition of Rahn Jackson ("Jackson Dep. Tr.") 404:5–6 (in the record at Dkt. No. 67 Ex. A). He went to work for Sun Microsystems shortly after leaving Microsoft. *Id.* at 101:12–16.

Mr. Jackson has since brought suit against Microsoft. Dkt. No. 1. Specifically, Mr. Jackson alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), the Civil Rights Act of 1991, 42 U.S.C. § 1981(a), and the Civil Rights Act of 1871, 42 U.S.C. § 1981. Dkt. No. 1. Although this matter was initially brought by Mr. Jackson and others on behalf of a purported class of fellow African American employees of Microsoft, the plaintiffs have since announced their intention to pursue their claims individually. Dkt. No. 87.

Mr. Jackson sat for a deposition on July 26 and 27, 2001. This was some ten months after leaving Microsoft. At that deposition, plaintiff turned over certain materials which defendant has learned were stolen from Microsoft. In addition, plaintiff turned over documents which had been altered and/or partially destroyed. Defendant brought its motion to dismiss on August 2, 2001, several days after the conclusion of the deposition. Dkt. No. 65. In support of its motion, defendant points to both the vast array of stolen materials in plaintiff's possession, and the extreme lengths to which plaintiff went to misrepresent both the source and scope of those materials. Because plaintiff's version of events has changed over time, and because the record surrounding these motions is extensive, the Court will lay out the key events relevant to its rulings in chronological order.

### A. Mr. Jackson's deposition

#### i. Mary Ellen O'Brien's info.pst file

Shortly before leaving Microsoft, defendant either stole from Microsoft or purchased from a Microsoft employee two compact discs ("CDs"). The CDs contain

upwards of 10,000 e-mail messages. Transcript of Second Evidentiary Hearing (December 12, and 13, 2001) ("Tr.II") at 243:16–20. The e-mails are located in a file titled info.pst. *Id.* at 217:1–2. The info.pst file originated in the computer of Mary Ellen O'Brien. *Id.* at 256:13–21. Ms. O'Brien was Mr. Jackson's supervisor at Microsoft. Defendant asserts, and plaintiff does not contest, that the CDs were created, and the info.pst file obtained, without the permission of either Ms. O'Brien or Microsoft. Both CDs contain identical copies of Ms. O'Brien's info.pst file. *Id.* at 220:5–8.

The info.pst e-mails contain significant amounts of privileged and other sensitive information. The Court has reviewed, in camera, a sampling of documents downloaded from the CDs, including all downloaded documents which were produced in hard copy format at Mr. Jackson's deposition. Dkt. No. 130. In recognition of the confidential nature of these items, the Court will not reveal their contents in any great detail. However, a description of their general nature is necessary in order to explain the grave concern which Mr. Jackson's behavior has caused the Court.

The CDs include materials revealing sensitive information about the Department of Defense ("DOD"), materials which reveal Microsoft's trade secrets,[1] and materials which contain confidential information about the evaluation and compensation of other Microsoft employees. The CDs also include confidential attorney-client communications between Microsoft management and counsel. Dkt. No. 130. These communications address Mr. Jackson's performance deficiencies and Mr. Jackson's claims of discrimination.

It was at his deposition that Mr. Jackson first disclosed to the defense that he was in possession of these CDs. He turned over the first of the two CDs on July 26, 2001, the first day of his deposition. *Id.* at 28:25–29:5.[2] When Mr. Jackson returned for the second day of his deposition, he turned over to defendant the second of the CDs. *Id.* at 29:6–7. At that time Mr. Jackson also turned over, at Microsoft's request, the hard drive to his laptop computer. *Id.* Later testing revealed that the hard drive contained the info.pst file as well. *Id.* at 244:2–11. In addition to turning over the CDs and the hard drive, Mr. Jackson turned over hard copies of materials also contained in those electronic formats. Mr. Jackson testified to printing out documents from the CDs totaling one half to three quarters of a ream of paper. *Id.* at 215:19–21. The materials which Mr. Jackson selected and printed from the CDs included Microsoft's proprietary business strategy, attorney-client communications about Mr. Jackson, and personnel information about other Microsoft employees.

*ii. Altered and damaged hard copy documents*

Mr. Jackson also produced at his deposition documents which have been partially destroyed. Dkt. No. 129. The source of these documents is unknown; they do not appear to be printed from the stolen CDs. Each of these documents is a hard copy of an e-mail message. *Id.* The top portion of each piece of paper has been removed. *Id.* Mr. Jackson testified that he intentionally removed and destroyed those portions of the e-mails which would identify the person who printed the document from an electronic format. Transcript of October 31, 2001 hearing ("Tr.I") (in the record at Dkt. No. 112) 83:15–84:1; 84:17–25; 85:6–21.[3]

From the mailing addresses on these e-mails, it appears that they were all widely distributed to Microsoft employees. The Court is therefore convinced that Microsoft is able to retrieve copies of these documents in their original, unaltered form. However, the

---

1. The trade secret materials include information about Microsoft's strategies for competing with Mr. Jackson's new employer, Sun Microsystems.

2. Although counsel for Mr. Jackson identified the deposition date as July 26, 2000, it is clear that the deposition in fact took place on July 26, 2001. *See, e.g.,* Dkt. No. 67 at ¶ 3.

3. This testimony refers to deposition exhibits 17–21. Mr. Jackson also destroyed portions of deposition exhibits 15 and 16. His motive in destroying portions of those documents is less clear. *See* Tr. I 80:1–83:14.

fact that the documents themselves were widely distributed does not change the fact that Mr. Jackson has gone to great lengths to hide the identity of the person or persons who provided the documents to him.

### iii. Hard copy personnel information

Mr. Jackson also produced at his deposition, in hard copy format, personnel records related to numerous Microsoft employees. Dkt. No. 130. Although the CDs contain certain personnel records as well, these documents are not contained on the CDs. Mr. Jackson has testified that he does not know how these items came into his possession. Tr. II 148:2–5.

### iv. Mr. Jackson's deposition testimony

Defense counsel questioned Mr. Jackson at length during his deposition about the manner in which he acquired the CDs. Mr. Jackson gave highly inconsistent answers to these questions. At times, he insisted that he did not know who gave him the CDs. See, e.g., Jackson Dep.Tr. 59:21–60:1. At other times, Mr. Jackson hedged his answers, indicating that he did not know with certainty who provided the CDs, since they appeared in his office mailbox without a note. See, e.g., id. at 60:12–16. At still other points in his deposition, Mr. Jackson stated that he in fact knew who had provided the CDs, but refused to furnish the information in order to attempt to protect his accomplice from retaliation by Microsoft. See, e.g., id. at 53:14–19. Mr. Jackson clearly stated that he did not request, nor pay for, the information on the CDs. Id. at 157:8–10 ("I received two copies of that CD. I have not copied, I have not asked someone to copy, or (sic) have not paid someone to copy that CD for me.")

Mr. Jackson was also questioned about when, and to what extent, he had reviewed the content of the CDs. He testified that he spent 5–10 days, at a rate of 3–4 hours per day, reviewing the CDs. Id. at 277:17–278:7. He also testified that he first looked at the CDs several days after acquiring them. Id. at 366:13–15. He acknowledged reading documents from the CDs that contained attorney-client communications and personnel information. Id. at 208:4–15; 258:12–19. Mr. Jackson also stated that some of the materials contained on the CDs supported the claims at issue in this litigation. Id. at 257:5–18.

Mr. Jackson acknowledged at his deposition that he distributed the contents of the CDs to others. He discussed the contents of the CDs with an unnamed person, and showed that person an e-mail contained on one of the CDs. Id. at 375:1–10; 377:21–378:15. He also acknowledged discussing the contents of the CDs with co-plaintiff Tanya Barbour.[4] Id. at 402:10–403:14. Mr. Jackson also testified that he sent hard copies of selected items off of the CDs to his counsel approximately one to two weeks prior to his deposition. Id. at 79:13–19.

Mr. Jackson was also questioned with respect to the altered and damaged documents. Mr. Jackson initially denied altering the documents. Id. at 405:13–406:1. Ultimately, however, he acknowledged that he cut and discarded portions of the e-mails in question. See, e.g., id. at 407:9–14; 412:9–11. Mr. Jackson stated that he altered the e-mails in order conceal the identity of the person or persons who had provided them to him. Id. at 409:1–6 ("... [I]f you will notice on this document immediately above the From header is the To header, and that was the most important information that I wanted to conceal from you guys ..."). Mr. Jackson declined to provide the identity of the person or person who provided these documents. See, e.g., id. at 413:1–4; 417:2–12.

### B. Mr. Jackson's declaration in opposition to defendant's motion to dismiss

In support of his opposition to defendant's motion to dismiss, Mr. Jackson produced a sworn declaration.[5] Tr. II Ex. 55. This declaration was dated August 23, 2001. Id.

---

4. Ms. Barbour's claims have since been dismissed. See Dkt. No. 108.

5. This document, along with all other declarations submitted in support of plaintiff's opposition to the motion to dismiss, was never made part of the record by plaintiff. The Court relies on it because it was offered into evidence by defendant at the second evidentiary hearing. This item will be cited as Exhibit 55 to the second evidentiary hearing.

Like Mr. Jackson's deposition testimony, the declaration contains statements which conflict with statements made by Mr. Jackson under oath at other times during the pendency of this litigation.

As to the identity of the person or persons who actually downloaded the info.pst file, Mr. Jackson stated "On page 5 (of defendant's memorandum in support of motion to dismiss), Microsoft alleges that I lied about how I got the CD, I did not lie. I testified that I have suspicions about who gave me the CD, but that I do not know." [6] *Id.* at ¶ 21. This testimony is in stark contrast to Mr. Jackson's statements under oath during his deposition and during the evidentiary hearings which the Court conducted after receiving Mr. Jackson's declaration. In those settings, Mr. Jackson admitted that he was well aware that Mr. New provided him with the CDs.

With respect to the theft of Ms. O'Brien's info.pst file, Mr. Jackson stated in his declaration that he "did not steal anything." Tr. II Ex. 55, ¶ 6. He also stated that "[t]here was no conspiracy" to obtain the info.pst file. *Id.* at ¶ 13. If Mr. Jackson in fact received the CDs without explicitly requesting them, then this testimony may be technically correct. At the very least, however, it creates the false impression that Mr. Jackson's role in obtaining the CDs was a passive one. At the second evidentiary hearing, Mr. Jackson went on to testify that he paid Mr. New $1,000 in gratitude for the CDs. Mr. Jackson apparently saw fit to omit this information from his declaration.

Mr. Jackson's declaration testimony with regard to the contents of the CDs was not truthful. During his deposition in July of 2001, Mr. Jackson testified about reviewing the contents of the CDs and attempting to use the documents contained therein in order to advance his litigation. Moreover, Mr. Jackson presented at his deposition documents which he had culled out from the CDs and which contained all manner of confidential information. These facts notwithstanding, Mr. Jackson went to great lengths in his declaration to convince the Court that he was unaware of the highly sensitive materials contained on the CDs:

- "When I searched the CD, I searched for my name as the subject. I did not know if there were proprietary documents on the CD. In fact, I still do not know if that is true. If there are such documents, I have no idea what they say." Tr II Ex. 55, ¶ 7.

- "Ms. Abell (counsel for Microsoft) says over and over and over that I had information about personnel and other Microsoft secrets which I retained while employed by Sun Microsystems for ten months. Again, no matter how many times Ms. Abell says this, it is still not true that I knew about or used any such documents or information no matter how many months I was employed by Sun Microsystems." *Id.* at ¶ 8.

- "Note that Microsoft never says that I even knew all the types of documents which were on the CD. Microsoft does not say any of that because Ms. Abell specifically chose not to ask me those questions. If she had, I would have told the truth, that I do not know even today all the types of documents on the CD, and I made no attempt to read them." *Id.* at ¶ 16.

- "Microsoft's Memorandum (in support of its motion to dismiss) ... again states that the CD contains highly sensitive trade secrets and proprietary information. Even now, I do not know if that is true of false. I never saw any such information, had no interest in any such information, never used any such information and never gave anyone any such information." *Id.* at ¶ 19.

### C. The first evidentiary hearing

On October 31, 2001, the Court conducted the first of two evidentiary hearings. Mr. Jackson testified at that hearing, and identified, for the first time, the name of the person alleged to have provided him with the CDs. Tr. I 67:1–23. This person was identified as Bobby New. According to Mr. Jackson, Mr. New approached Mr. Jackson and inquired about the status of Mr. Jackson's law suit against Microsoft. *Id.* at 68:15–25. Mr. Jackson testified that he asked Mr. New to "watch my back." *Id.* at 69:1–2. Shortly

---

6. For reasons that have never been entirely clear to the Court, the parties refer to the two stolen CDs as "the CD" throughout most of the briefing on these motions.

thereafter, the CDs appeared in Mr. Jackson's mailbox at work. *Id.* at 69:19–20. Although Mr. Jackson continued to maintain that Mr. New did not deliver the CDs to him in person, he was clear with the Court that the CDs were provided by Mr. New. *Id.* at 79:20–25.

### D. The second evidentiary hearing

Before the Court was able to issue a ruling on defendant's motion to dismiss, plaintiff filed his motion to strike Microsoft's answer. Dkt. No. 126. Plaintiff argued in his motion that sanctions against defendant were appropriate because defense counsel implied at the October 31, 2001 hearing that they did not know who had worked with Mr. Jackson to unlawfully obtain Ms. O'Brien's info.pst file. *See, e.g.,* Tr. I 40:15–17 ("We have to take his word that he didn't do it alone, that he got some help."). From the content of defendant's cross-examination of Mr. Jackson at the October 31, 2001 hearing, it was clear that defendant already knew that Mr. New was a possible accomplice in the theft of Ms. O'Brien's computer files.

The record in this matter was further complicated when Microsoft filed its response to plaintiff's motion to strike answer. Attached to the response was a sworn declaration from Bobby New. Dkt. No. 141. In that declaration, Mr. New alleged that he once copied information from *Mr. Jackson's* hard drive to a CD. Dkt. No. 141 ¶ 4. Mr. New denied any knowledge of the contents of the files downloaded from Mr. Jackson's hard drive. *Id.* at ¶ 7. Mr. New additionally denied that he ever knowingly "made a CD for Mr. Jackson that contains files belonging to anyone but him." *Id.* at ¶ 18.

The Court called for a second evidentiary hearing in order to resolve two issues. First, the Court felt that an evidentiary hearing was necessary in order to assess the degree to which Mr. Jackson had been truthful with the Court in his prior testimony. Second, the Court wanted to hear argument on the extent of defense counsel's misrepresentations to the Court and the prejudicial effect, if any, that those misrepresentations had on plaintiff. The parties acknowledged their understanding of the purpose for which the

evidentiary hearing was set. *See, e.g.,* Tr. II 10:5–12:2; 19:5–16. This hearing resulted in a number of startling revelations about Mr. Jackson's participation in the theft from Microsoft.

Mr. Jackson provided yet another version of events surrounding his acquisition of the CDs. First of all, Mr. Jackson retreated from his prior unequivocal statement that the CDs were provided by Mr. New. Instead, Mr. Jackson returned to his earliest version of events, claiming that he only had "suspicions" about who provided him with the CDs. Tr. II 135:24–136:4. Despite Mr. Jackson's steadfast insistence that he only suspected Mr. New as the provider of the CDs, Mr. Jackson further confessed to paying Mr. New one thousand dollars "in appreciation" after receiving the stolen goods. *Id.* at 137:19–138:3. The one thousand dollars was paid by personal check. *Id.* at 195:2–3. Mr. Jackson testified that he offered to make the check out to Mr. New's mother in order to protect Mr. New. *Id.* at 199:9–11; 201:11–13. According to Mr. Jackson, when Mr. New declined to have the check made out in such a way, Mr. Jackson simply left the payee line blank. *Id.* at 195:23–24; 196:8–9. Mr. Jackson also testified that he used his mother and Mr. New's mother as intermediaries in order to send messages to Mr. New. *Id.* at 174:22–25. There were approximately 5–7 of these conversations between July 27, 2001 and November 28, 2001. *Id.* at 175:9–17. Mr. Jackson used this method of communication because he was afraid to contact Mr. New directly. *Id.* at 175:1–5.

In addition to testifying about his relationship with Bobby New, Mr. Jackson also testified at the second evidentiary hearing about the extent to which he accessed the materials on the CDs. Much of this testimony was impeached by the expert witnesses called by both parties. Before reaching the evidence submitted by the expert witnesses, the Court will address the statements made by Mr. Jackson.

Mr. Jackson testified that he did not copy any CD containing Ms. O'Brien's e-mail onto his hard drive. *Id.* at 130:25–131:3; 144:3–5. Mr. Jackson also testified that he never viewed Ms. O'Brien's info.pst file from his

hard drive. *Id.* at 144:6–10. Specifically, Mr. Jackson testified that he did not access the info.pst file on his hard drive between day one and day two of his deposition. *Id.* at 133:21–134:4; 146:23–147:2. According to Mr. Jackson, no one else had access to his laptop computer between the first and second days of his deposition. *Id.* at 134:5–9. Mr. Jackson testified that he did not open the CDs and examine their contents until several weeks after he received them. *Id.* at 138:13–20.

In essence, Mr. Jackson asserts that he did not read the stolen CDs until weeks after he received them, that he never transferred their contents to his computer hard drive, and that he never accessed the stolen materials on his hard. drive at all, let alone in the evening between days one and two of his deposition. The testimony of the expert witnesses blatantly contradicts all of these assertions.

Prior to the second evidentiary hearing, expert witnesses for both parties had an opportunity to examine exact duplicates of the CDs and of Mr. Jackson's hard drive. Kevin Bluml, defendant's expert witness, testified that both CDs and the Jackson hard drive contained the info.pst file. *Id.* at 217:1–8. According to Mr. Bluml, the creation date of the first CD could not have been prior to September 28, 2000, at 4:58 a.m. *Id.* at 224:12–15. The earliest date and time that the second CD could have been created was September 28, 2000 at 8:52 a.m. *Id.* at 224:18–20. The creation date of the info.pst file on Mr. Jackson's hard drive was September 28, 2000 at 8:54 p.m. *Id.* at 225:16–18. In the simplest terms, the CDs were created the day before Mr. Jackson left his employment at Microsoft, and the information on the CDs was placed on Mr. Jackson's hard drive later the same evening.

Mr. Bluml was also able to determine the date when Mr. Jackson had most recently accessed the info.pst file on his computer hard drive. That date was July 27, 2001, at 12:56 a.m. *Id.* at 225:25–226:4. This was the night between days one and two of Mr. Jackson's deposition. Mr. Bluml prepared a list of all items in the info.pst file which were accessed between July 26 and July 27, 2001.

Tr. II Ex. 62. Although the Court has not counted the total number of files accessed, the Court notes that the list is quite lengthy.

The testimony of plaintiff's expert witnessed differed very little from that of Mr. Bluml. Mr. Gregory Henig, plaintiff's expert, offered one significantly different piece of testimony from that proffered by defendant's expert. Mr. Henig testified that the info.pst file on Mr. Jackson's hard drive was created on July 26, 2001 at 11:56 p.m. Tr. II 330:3–11. Mr. Henig testified that he was not particularly confident in his own opinion. *Id.* at 330:12–16. It is significant that both experts agree that Ms. O'Brien's info.pst file appears on Mr. Jackson's hard drive. The expert testimony supports a finding that the info.pst file was placed on Mr. Jackson's hard drive either the evening after the CDs were created, or the night between days one and two of Mr. Jackson's deposition.

## ANALYSIS

### I. Defendant's motion to dismiss

#### A. *The Court's inherent power to dismiss*

The Court has "inherent power" to sanction for discovery violations. *Anheuser–Busch, Inc., v. Natural Beverage Distribs.,* 69 F.3d 337, 348 (9th Cir.1995). Sanctions may include dismissal. *Id.* The Ninth Circuit has adopted two similar sets of factors which the Court must consider when evaluating whether dismissal is an appropriate sanction.

In one line of cases, these factors are listed as: "(1) the existence of certain extraordinary circumstances; (2) the presence of willfulness, bad faith or fault by the offending party; (3) the efficacy of lesser sanctions; (4) the relationship or nexus between the misconduct drawing the dismissal sanction and the matters in controversy in the case; and finally, as optional considerations where appropriate, (5) the prejudice to the party victim of the misconduct, and (6) the government interests at stake." *Halaco Eng'g Co. v. Costle,* 843 F.2d 376, 380 (9th Cir.1988).

The *Halaco* factors have metamorphosed somewhat over time, although the essence of the Court's inquiry remains the same. The Court is now compelled to exam-

ine "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Anheuser–Busch,* 69 F.3d at 348. Because the first two of these factors will generally favor the imposition of sanctions, and the fourth factor cautions against dismissal, "the key factors are prejudice and the availability of lesser sanctions." *Wanderer v. Johnston,* 910 F.2d 652, 656 (9th Cir.1990).

■ For dismissal to be proper, the conduct to be sanctioned must be characterized by "willfulness, fault, or bad faith." *Anheuser–Busch,* 69 F.3d at 348 (internal citations omitted). "Due process concerns further require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the case.'" *Id.* (*quoting Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 591 (9th Cir.1983)).

The Court is obligated to examine carefully all of the factors set forth under *Anheuser–Busch.* However, "the list of factors amounts to a way for a district judge to think about what to do, not a series of conditions precedent before the judge can do anything, and not a script for making what the district judge does appeal-proof." *Valley Eng'rs Inc. v. Elec. Eng'g Co.,* 158 F.3d 1051, 1057 (9th Cir.1998).[7] With the *Anheuser–Busch* factors in mind, the Court turns to the facts at issue in these motions.

■ The Court begins by stating what the record makes obvious; Mr. Jackson's conduct was willful and exemplifies the bad faith with which he has pursued this litigation. Although the parties have bickered for months over the exact manner in which Mr. Jackson obtained Ms. O'Brien's info.pst file, there are some facts which are beyond dispute. Mr. Jackson received 10,000 e-mails from an unknown source. Those e-mails included Microsoft's proprietary secrets, Microsoft's confidential attorney-client work product, and confidential information regarding the evaluation and compensation of other Microsoft employees. Mr. Jackson paid $1,000 for these CDs.

Mr. Jackson retained the CDs for ten months before finally turning them over to defendant. Initially, Mr. Jackson returned only one of the CDs. He retained the second CD until the second day of his deposition. The information contained on the CDs was transferred to Mr. Jackson's hard drive either the evening he came to possess the CDs, or during the night between day one and two of his deposition. During that evening, and before finally turning over the second CD and his tainted hard drive, Mr. Jackson accessed enormous amounts of this stolen data.

Mr. Jackson also possessed hard copy personnel data which was not contained on the CDs or on his hard drive. Mr. Jackson claims not to remember how he came to possess this data, and no satisfactory explanation has been presented to the Court. In addition to this personnel data, Mr. Jackson also had in his possession e-mails which he partially destroyed before turning over to defendant.

Mr. Jackson's conduct in obtaining (and in some cases altering) this vast quantity of Microsoft's data was egregious in the extreme. A theft on this scale would be sufficient reason to justify dismissal. *See, generally, Perna v. Elec. Data Sys. Corp.,* 916 F.Supp. 388 (D.N.J.1995). Plaintiff's secretive behavior and clear reliance on the stolen documents in the preparation of his case only makes dismissal more appropriate. Sadly, Mr. Jackson's misconduct did not cease when he finally turned over the stolen materials to their rightful owner. Beginning at least with his deposition, Mr. Jackson told an ever more elaborate series of lies about his misconduct.

---

7. *Valley Eng'rs* involved sanctions imposed not under the Court's inherent powers but instead under Fed.R.Civ.P. 37(b). However, the Court's analysis appears to be the same when considering sanctions pursuant to its inherent powers as it is when considering sanctions pursuant to Fed. R.Civ.P. 37(b). *See, e.g., Toth v. Trans World Airlines, Inc.,* 862 F.2d 1381, 1385 (9th Cir.1988) (adopting the same factors as those used in *Anheuser–Busch* when evaluating the appropriateness of dismissal as a sanction for Rule 37(b) violations).

This began with Mr. Jackson's perjured statements at his deposition, and continued through a sworn declaration and two separate evidentiary hearings.

"It is well settled that dismissal is warranted where ... a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings: [C]ourts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Anheuser–Busch,* 69 F.3d at 348 (internal citations omitted). Mr. Jackson's attorney, at the second evidentiary hearing, urged the Court "not to cut off his ability to seek justice." Tr. II 396:20–21. Based on Mr. Jackson's astonishing pattern of deceptive acts and fraudulent testimony, the Court finds no assurance that a trial in this matter would indeed be a fact-finding endeavor. Mr. Jackson has undermined the truth-finding function of the Court beyond repair.

Before imposing dismissal as a sanction for Mr. Jackson's misconduct, the Court must consider the risk of prejudice which Mr. Jackson has caused to defendant. Despite Mr. Jackson's protestations to the contrary, the Court finds that Microsoft has been prejudiced in its ability to fairly defend itself in this litigation. Mr. Jackson has obtained a vast number of confidential documents. The parties dispute whether all copies of the documents have since been returned, and the record is not clearly developed enough to permit a finding on this issue. However, even assuming that Mr. Jackson has now returned all purloined documents, the damage to Microsoft has been done. Mr. Jackson clearly spent considerable time and attention reading and referring to the items at issue. He sent selected copies to his attorneys, and discussed the documents with at least two additional people. Mr. Jackson's knowledge of Microsoft's proprietary information cannot be erased. Some of this proprietary information goes directly to the heart of this litigation. Mr. Jackson had in his possession for ten months memoranda in which Microsoft management discussed with one another, and with counsel, the manner in which they would choose to respond to Mr. Jackson's allegations of mistreatment by Microsoft. Mr. Jackson also had in his possession for ten months documents regarding the evaluation and compensation of other Microsoft employees. Microsoft has suffered prejudice which can only be cured by dismissal.

The Court must also consider the availability of less drastic sanctions. Although the Court must consider the efficacy of such sanctions, "it is not always necessary for the Court to impose less serious sanctions first, or to give any explicit warnings." *Valley Eng'rs,* 158 F.3d at 1057. The Court can conceive of no sanctions which would cure plaintiff's extensive access to defendant's privileged and confidential materials and which would assure plaintiff's honesty in the proceedings to come.

"It is appropriate to reject lesser sanctions where the court anticipates continued deceptive misconduct." *Anheuser–Busch,* 69 F.3d at 352. Had plaintiff come forward early and cured his own misconduct, perhaps alternate sanctions would be appropriate. Instead, plaintiff has been evasive and untruthful at every turn. Plaintiff has provided sworn testimony on four occasions since July of 2001. After hearing Mr. Jackson's deposition testimony, his sworn declaration, and his testimony at the first evidentiary hearing, the Court explicitly warned Mr. Jackson that the purpose of the second evidentiary hearing was to assess credibility. At the time that the Court called for the second evidentiary hearing, defendants' motion to dismiss was pending and Mr. Jackson clearly knew that dismissal was a possibility. Despite this opportunity to come forward and be forthright, Mr. Jackson continued to perjure himself. He was once again evasive about the manner in which he obtained the CDs, and he was patently dishonest about when and to what extent he accessed the stolen materials once he acquired them. The Court can conceive of no other sanction which would promote fairness to all parties in this proceeding.

As the Court stated on the record at the close of the second evidentiary hearing, it is unfortunate that Mr. Jackson will not have an opportunity to litigate the substance of his claims. However, Mr. Jackson has—in a

series of events spanning well over a year— done such damage to his case that dismissal is the only viable remedy. The Court can, and must, invoke its inherent powers to dismiss this litigation.

### B. Dismissal as a result of Mr. Jackson's invocation of his Fifth Amendment rights

■ Mr. Jackson invoked his Fifth Amendment right against self-incrimination at the second evidentiary hearing, and as a result declined to answer certain questions posed by defendant. The Court must address what impact, if any, that invocation has on its analysis of the pending motions. "Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof." *SEC v. Colello,* 139 F.3d 674, 677 (9th Cir.1998). Such adverse inferences may be drawn only when "independent evidence exists of the fact to which the party refuses to answer." *Doe ex rel. Rudy–Glanzer v. Glanzer,* 232 F.3d 1258, 1264 (9th Cir.2000). Such inferences may also only be drawn when "there is a substantial need for the information and there is not another less burdensome way of obtaining the information." *Id.* at 1265.

■ When a party does invoke his rights under the Fifth Amendment, and when the Court is indeed entitled to draw a negative inference from that invocation, the Court has discretion to impose penalties for the invocation of Fifth Amendment rights. *SEC,* 139 F.3d at 677; *See also Serafino v. Hasbro,* 82 F.3d 515, 518 n. 5 (1st Cir.1996) (noting that "a number of courts have acknowledged the court's power to dismiss even in the face of a party's proper assertion of the privilege.").

■ Mr. Jackson attempted to assert his Fifth Amendment privilege at the first evidentiary hearing when asked to identify the person who provided him with the stolen CDs. The Court overruled Mr. Jackson's assertion of the privilege, as it was asserted not to protect against self-incrimination but because Mr. Jackson wanted to "protect" his co-conspirator. Tr. I. 67:2–3. The Fifth Amendment privilege was first properly asserted during the second evidentiary hearing.

During the second evidentiary hearing, Mr. Jackson refused to answer the following question, which was posed by defendant: "Could you explain to us in the clearest way you can what you think the thousand dollar check has to do with Mary Ellen O'Brien's file theft?" Tr. II 142:11–13. Because there is ample additional evidence that Ms. O'Brien's files were indeed stolen, and that Mr. Jackson paid for the items, the Court is entitled to consider whether adverse inferences are appropriate. Microsoft has a substantial need for the information for several reasons. One, Mr. Jackson's willingness to pay for stolen information goes directly to his credibility. Two, the question goes generally to Microsoft's investigation of what was stolen, by whom, and when. Although it is clear that Mr. Jackson participated in some way in this theft, the details remain murky. In addition to its need to defend against this suit, Microsoft has a legitimate interest in protecting and retrieving stolen information. Because Mr. New denied that he accepted the check in exchange for assisting Mr. Jackson with the theft, Microsoft has no alternate means of answering this question.

Mr. Jackson also asserted the privilege when asked "[d]id you pay anyone to access Microsoft's computer network for you?" Tr. II 147:8–9. For the reasons stated above, Microsoft was entitled to ask this question, and had no alternate means to obtain an answer. The record supports a clear inference that Mr. Jackson did in fact pay for unlawful access to Microsoft's information, whether it was via Ms. O'Brien's hard drive or via the Microsoft network.

Mr. Jackson asserted the Fifth Amendment privilege when asked "[w]hat else did you tell Mr. New about your involvement in the commission of a crime?" *Id.* at 187:11–12. Mr. New had previously testified that he accepted the $1,000 check not as compensation for the theft, but for an unrelated social activity. Microsoft was entitled to know whether Mr. New was indeed an unwitting accomplice, or whether the two men worked in concert to steal from Microsoft. This issue goes to Mr. Jackson's credibility, and also to the scope of the theft that Microsoft

had suffered. Microsoft had no other source of information from which to obtain this information.

Finally, Mr. Jackson asserted his privilege when asked a series of questions about whether he had used certain words, such as "theft," "steal," "conspiracy," or "perjury" in his discussions with Mr. New. *Id.* at 190:1–2; 190:14–15; 190:24–25; 191:9–10. While Microsoft is clearly entitled to know what actions Mr. New and Mr. Jackson took to steal Microsoft property, the manner in which Mr. Jackson characterized those actions is irrelevant. The Court draws no adverse inferences from Mr. Jackson's failure to answer these particular questions.

Mr. Jackson refused to answer several questions which went to the heart of the investigation of Mr. Jackson's unlawful activities. The Court is entitled to draw adverse inferences from Mr. Jackson's refusal to respond to defendant's inquiry. The invocation of the privilege against self-incrimination in this context provides a further basis for sanctions. The fact that Mr. Jackson invoked the privilege only a handful of times might in other circumstances warrant a sanction less drastic than dismissal. However, in this situation defendant is caught between the proverbial rock and a hard place. When Mr. Jackson chose to answer questions posed to him under oath, he provided evasive and untruthful answers. When Mr. Jackson chose to invoke the Fifth Amendment, as he was entitled to do, he gave no answer at all. Defendant was thus left to chose between a series of misleading and untruthful answers and complete silence. After months of investigating, defendant is no closer to a satisfactory resolution of who took its documents, how they were stolen, to what extent they were distributed in the community at large, and whether they have been returned.

The adverse inferences which the Court must draw from plaintiff's invocation of his Fifth Amendment privilege provides further support for the decision to dismiss plaintiff's claims.

## II. Plaintiff's motion to strike answer

■ Plaintiff's motion to strike defendant's answer is premised on the assertion that defendant's counsel knew at the first evidentiary hearing, but did not disclose to the Court, that Bobby New had conspired with Mr. Jackson to steal Ms. O'Brien's computer files. The Court agrees with plaintiff that defense counsel's statements to the Court were less than forthcoming. Counsel did not reveal to the Court that any suspect had been identified or any leads pursued in the search to uncover the "leak" that resulted in the theft of Ms. O'Brien's files.

While defense counsel may have left the Court, and opposing counsel, with an inaccurate impression regarding the state of their investigation, no statements made by counsel were in fact false. For example, defense counsel stated that "[w]e have to take his word that he didn't do it alone, that he had some help. We don't know whether that's true." Tr. I. 40:15–17. At the time this statement was made, Mr. New had been interviewed by defense counsel and had insisted that he downloaded a CD from Mr. Jackson's computer and that he had no reason to believe that the downloaded CD contained proprietary information. No information had come to light about any money changing hands between Mr. Jackson and Mr. New.[8] Although Mr. New's participation seems more certain after the second evidentiary hearing, Microsoft did not know at the time of the first evidentiary hearing how Mr. Jackson came to be in possession of the CDs, nor the extent to which Mr. New participated in the theft.

Even if the Court were to conclude that defense counsel made material misrepresentations to the Court, the remedies sought by plaintiff are inappropriately harsh. Plaintiff in essence seeks an entry of judgment on his behalf. Defense counsel's conduct, however inappropriate, does nothing to change the Court's analysis with regard to the dismissal of plaintiff's case. That analysis rests squarely on misconduct perpetrated by plaintiff. It was plaintiff who stole documents from Microsoft, it was plaintiff who used those documents to advance his litigation,

8. Ironically, that information was introduced into evidence not by defendant but by plaintiff.

and it was plaintiff who perpetrated—over and over again—a fraud on the Court. The motion to strike is not well taken, and it is DENIED.

### CONCLUSION

For the reasons set forth more fully above, the Court ORDERS as follows:

- Defendant's motion to dismiss (Dkt. No. 65) is GRANTED. The Court finds that Mr. Jackson has unlawfully obtained proprietary materials from Microsoft and has perpetrated a lengthy series of elaborate misrepresentations and lies to both the Court and counsel. Having considered the prejudice caused by Mr. Jackson to defendant and to the Court, having considered and rejected less drastic sanctions, and having drawn the requisite negative inferences from plaintiff's invocation of his Fifth Amendment privilege, the Court concludes that dismissal of this matter is the only appropriate remedy.

- Defendant's motion to strike declaration (Dkt. No. 92) is MOOT and is STRICKEN. On December 13, 2001, defendant offered into evidence the same declaration which is the subject of this motion.

- Plaintiff's motion to strike answer (Dkt. No. 126) is DENIED. Plaintiff's motion arises from allegations that counsel for defendant made misrepresentations to the Court during the first of two evidentiary hearings held regarding defendant's motion to dismiss. While the Court agrees that counsel's comments were inappropriate and somewhat misleading, they do not rise to the level of sanctionable conduct.

- Plaintiff's motion to strike opposition (Dkt. No. 145) is DENIED.

The clerk of the Court is directed to distribute a copy of this Order to all counsel of record.