923 A.2d 1032

**Christopher S. WEAVER**

v.

**ZENIMAX MEDIA, INC.**

**No. 2368 Sept. Term, 2005.**

Court of Special Appeals of Maryland.

May 25, 2007.

20

Andrew J. Graham, Baltimore, MD, Ronald L. Early, J. Bradford McCullough, on the brief, Bethesda, MD, for Appellant.

Howard H. Stahl (Morgan D. Hodgson, Bruce C. Bishop, Andrew J. Hefty, Steptoe & Johnson, LLP, on the brief), Washington, DC, for Appellee.

Panel: SALMON, KENNEY *, and DEBORAH S. EYLER, JJ.

Opinion by KENNEY, Judge.

Christopher S. Weaver appeals the judgment of the Circuit Court for Montgomery County dismissing his action for declaratory relief and breach of contract against ZeniMax Media, Inc. ("ZeniMax"), the award of attorney's fees and costs to ZeniMax, and the grant of summary judgment in favor of ZeniMax on its counterclaim for breach of contract. He presents three questions, which we have reordered:

I. Did The Trial Court Commit Reversible Error In Dismissing Mr. Weaver's First Amended Complaint Based On His Pre–Litigation Acts?

[II.] Did The Trial Court Commit Reversible Error In Awarding ZeniMax Fees And Costs Pursuant to Rule 1–341?

[III.] Did The Trial Court Commit Reversible Error In Finding That Mr. Weaver's Pre–Litigation Acts While Employed by ZeniMax Were a Substantial And Material Breach Of His 1999 Agreement Barring Any Recovery By Him of His $1,200,000 Severance Payment?

ZeniMax filed a cross-appeal challenging the circuit court's award of attorney's fees and grant of summary judgment in favor of Weaver on ZeniMax's counterclaim for breach of duty

---

* Kenney, J. now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he participated also in the decision and adoption of this opinion.

of loyalty. It presents the following two questions, which we have reordered:

 Did the trial court abuse its discretion by substantially reducing ZeniMax's attorneys' fees award:

a. based on the dismissal of Weaver's claim, where the claim was meritless or at least highly speculative since it had not been tried?

b. on the basis that Weaver's misconduct somehow benefitted ZeniMax, by saving ZeniMax from having to continue to defend Weaver's baseless lawsuit?

c. by eschewing examination of counsel's hours and rates, instead imposing an admittedly somewhat arbitrary estimate of a reasonable fee?

 Did the trial court err by granting Weaver summary judgment on breach of fiduciary duty, solely for "lack of remedy," where Weaver's disloyal actions were clear and undisputed, and where ZeniMax was entitled to several remedies, including damages incurred in defending this action, disgorgement of Weaver's salary and benefits, and a declaration that Weaver could not recover contractual severance benefits?

For the following reasons, we shall vacate the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

### Weaver's Employment Dispute with ZeniMax

Weaver is the founder of Bethesda Softworks, which has developed numerous successful computer games. Weaver and Robert Altman founded ZeniMax, which acquired Bethesda Softworks in 1999. At the founding of ZeniMax, Altman was Chief Executive Officer and Chairman of the Board of Directors; Weaver was Chief Technology Officer and a member of the Board. Altman and Weaver each owned approximately thirty percent of the ZeniMax stock. ZeniMax is a Delaware corporation.

Weaver entered into an executive employment agreement with ZeniMax on July 1, 1999. With respect to Weaver's period of employment, termination, and renewal, the contract provided:

1. *Full-time Employment of Executive.*

1.1 *Duties and Status.*

(a) The Company hereby engages the Executive as CHIEF TECHNOLOGY OFFICER for the period (the "Employment Period") specified in Section 4, and the Executive accepts such employment on the terms and conditions set forth in this Agreement. During the Employment Period, the Executive will exercise such duties as are commensurate with the duties of Chief Technology Officer of the Company and shall report directly to the Chief Executive Officer of the Company or his designee.

(b) During the Employment Period, the Executive shall (i) devote his full time and efforts to the business of the Company and will not engage in consulting work or any trade or business for his own account or for or on behalf of any other person, firm or Company which competes or conflicts or interferes with the performance of his duties hereunder in any way and (ii) accept such additional duties as may be assigned, and such additional office or offices to which he may be appointed by the Chief Executive Officer of the Company or his designee, provided that the performance of such additional duties and such additional office or offices shall be reasonably consistent with the scope of the duties described in subparagraph 1.1(a) of this Agreement; *provided, however,* that Executive may engage in part-time teaching at an accredited high school, college, or university, and that Executive may continue to provide consulting services to the businesses and organizations listed on Schedule A hereto. Notwithstanding anything to the contrary in this Section 1.1(b), upon the prior written approval of the Chief Executive Officer of the Company, Executive shall have the right to engage in other activities during the Employment Period, including without limitation, teaching and consulting, provided that such activities do not conflict

with any of the terms or provisions of this Agreement or the Executive's responsibilities to the Company set forth herein.

\* \* \*

### 4.1 *Employment Period.*

The Employment Period shall commence on the date hereof and shall continue until the earliest of (i) three (3) years from the date hereof (the "Employment Term"); (ii) the Executive's death or total disability; (iii) a termination by the Company under Section 4.2 or 4.3 hereof; (iv) a resignation under Section 4.5 hereof; or (v) a termination by the Executive under Section 4.6 hereof.

### 4.2 *Termination by the Company with Cause.*

(a) In the event the Company terminates the Executive's employment under this Agreement on or before the Employment Term, with Cause, the Executive will be not be [sic] entitled to any further compensation or benefits after the date of termination other than those benefits and payments which have been earned and are payable as of the date of termination or which have been earned and will become payable without regard to future services.

(b) For purposes of this Section 4 "Cause" shall mean (i) the commission of an act involving fraud in the course of the performance of Executive's duties, (ii) intentional material damage to the property or business of the Company and (x) such damage has not immediately ceased and (y) such damage had not been cured by Executive within twenty-one (21) days following the receipt of written notice by the Executive from the Board of Directors specifying the action causing damage and demanding cessation of such action and cure of such damage, (iii) the conviction of the Executive of a crime constituting a felony, (iv) conduct that constitutes a material breach of this Agreement, subject to the Executive's right to cure such conduct within twenty-one (21) days following receipt of written notice to the Executive by the Board of Directors specifying such breach, or (v) continuance of failure by the Executive to perform his duties in accordance with this Agreement after receipt of written

notice to the Executive by the Board of Directors specifying such failure and such failure has not been cured within twenty-one (21) days following the receipt of such notice by the Executive; *provided, however,* that in any case such "Cause" shall not be found to exist absent a unanimous vote of the non-interested members of the Board of Directors.

**4.3 *Termination by the Company without Cause.***

(a) In the event the Company terminates the Executive's employment under this Agreement on or before the Employment Term, without Cause, then (i) the Company shall, immediately upon such event, pay to the Executive the sum equal to the greater of four times his then Annual Base Salary or $1,200,000 paid in equal installments over the twelve-month period following such termination and shall thereafter provide to the Executive a continuation of his health and welfare benefits for a period of three (3) years; and (ii) the Executive shall not be obligated to fulfill his obligations hereunder, with the exception of his obligations under Sections 5, 6, 7, 8, 9 and 10, which shall survive any termination of this Agreement. If for any reason the Company is unable to continue health and welfare benefits as required by the preceding sentence, the Company shall either provide equivalent benefits to the Executive or pay to the Executive a lump sum cash payment equal to the value of the benefits which the Company is unable to provide.

(b) Termination by the Company without cause shall include, among other reasons, a termination (i) by the Company of the employment of the Executive for any reason other than death or Total Disability of the Executive or Cause; or (ii) the breach by the Company of any other provision of this Agreement.

**4.7 *Non–Renewal by Company.***

Upon any expiration of this Agreement as a result of the determination of the Company not to renew the Executive's Employment Agreement, upon the effective date of such expiration, the Executive shall be entitled to receive the same payments and benefits as he is entitled to receive following an involuntary termination of his employment by

the Company without Cause, as specified in Section 4.3 herein.

By late 2001, Weaver's and Altman's relationship had deteriorated due to disagreements over Weaver's performance, his time away from the office teaching, his paid time off, and perquisites of his employment. Nevertheless, in Spring 2002, Weaver informed Altman that he wished to renew his employment agreement with ZeniMax, which was set to expire July 1. Altman responded with a draft employment agreement containing terms different from the 1999 contract. Dissatisfied with this offer, Weaver replied with a draft contract of his own that he requested Altman present to the Board. Altman informed Weaver that he did not expect the Board to approve the contract presented by Weaver, and that he considered the contract he had presented to Weaver to be a fair offer and one the Board would approve. No agreement was reached prior to the July 1 deadline.

Weaver informed ZeniMax that because, in his view, it had failed to renew his employment agreement, he was entitled to the severance package provided for in section 4.3 of the 1999 contract. ZeniMax's Vice President for Legal Affairs, J. Griffin Lesher, responded that ZeniMax did not consider the nonrenewal provision applicable. ZeniMax took the position that Weaver had rejected its renewal offer.

On December 13, 2002, Weaver filed a complaint in the Circuit Court for Montgomery County seeking a declaratory judgment regarding whether he was entitled to the nonrenewal benefits of section 4.3 of the contract. On the same date, he also moved for summary judgment. Weaver later amended his complaint, adding counts for breach of contract and wage payment. ZeniMax answered Weaver's complaint on January 17, 2003, and on February 19, 2003, filed a two-count counterclaim for (1) breach of fiduciary duty of care, and (2) breach of contract. ZeniMax alleged that Weaver had mismanaged company projects, claimed paid time off beyond the four weeks of vacation provided by the contract, and received

reimbursement of travel and other expenses that were not company-related.

## Weaver's Misconduct and the Resulting Sanction

In the course of discovery, Weaver produced printouts of certain e-mails between ZeniMax executives. One of the e-mails was from Chief Financial Officer Cindy Tallent to Lesher, and appears to have been printed from Lesher's e-mail account.[1] Four of the e-mails were from Altman to various ZeniMax employees, not including Weaver, and appear to have been printed from Altman's e-mail account.[2] One of the e-mails was from Altman to Weaver, but appears to have been printed from Altman's e-mail account.[3]

During Weaver's deposition on August 27, 2003, counsel for ZeniMax asked him how he had obtained the e-mails. At first, Weaver invoked the Fifth Amendment, but later he revealed that he had, on multiple occasions in 2001 and 2002, used his "master key" to enter Altman's and Lesher's offices outside of normal business hours. He used Altman's computer to log into Altman's e-mail account and searched for e-mails related to their disagreements and Weaver's future employment with ZeniMax. Weaver printed the e-mails that he considered relevant to those issues. In Lesher' s office, Weaver reviewed various documents, including Board meeting minutes and his and other ZeniMax executives' employment agreements. Weaver also copied and printed other e-mails to which he was not a party without actually logging onto other employees' computers. His purpose was to investigate whether, as he suspected, certain ZeniMax executives, including Altman and company President Ernest Del, were attempting to force him out of the company.

---

1. The name "J. Griffin Lesher" appears on the header of the (continued ...) e-mail. Lesher later testified that his name appears on the header of every e-mail printed from his account.

2. The name "Robert Altman" appears on the header of the e-mails.

3. The name "Robert Altman" appears on the header of the e-mail.

After the deposition, Weaver turned over to ZeniMax numerous other e-mails he had obtained. He also produced a draft of a proposed employment agreement that contained handwritten notes. He later explained that he had found the draft contract in the trash receptacle in Altman's office.

On October 27, 2003, ZeniMax filed an amended counterclaim, adding a count for breach of fiduciary duty of loyalty based on Weaver's conduct in obtaining the e-mails and draft contract. On November 12, 2003, ZeniMax filed a motion for sanctions or dismissal of Weaver's complaint based on his conduct and his initial failure to produce the documents to ZeniMax.

On February 27, 2004, the court held a hearing on ZeniMax's motion for dismissal or sanctions, as well as various other motions.[4] ZeniMax urged the court to first consider its motion to dismiss or for sanctions, arguing that there was a threshold question of whether Weaver had so abused the judicial process that he should not be permitted to go forward with his claims. The court agreed to consider the motion first and, after hearing argument from both sides, reserved on the motion until after an evidentiary hearing on Weaver's conduct. The court heard argument on, and granted, Weaver's motion to strike ZeniMax's jury demand and claim for punitive damages.

Both parties submitted additional memoranda on ZeniMax's motion to dismiss or for sanctions. The evidentiary hearing took place April 1, 2004 and May 5, 2004. ZeniMax called Weaver to testify. He stated that in 2001 he had become suspicious that Altman and other corporate executives were

---

**4.** Weaver had moved for summary judgment on counts 1 and 3 of the counterclaim, and for partial summary judgment on count 2 of the counterclaim. Weaver had also moved for summary judgment on counts 1 and 2 of his complaint. Weaver had moved to strike ZeniMax's demand for a jury trial and its claim for punitive damages. He had also moved to compel discovery.

ZeniMax had moved for summary judgment on counts 2 and 3 of its counterclaim. It had also moved to dismiss count 3 of Weaver's complaint.

planning to oust him from the company or limit his control. In August or September 2001, he entered Lesher's office at night, without permission, to look through Board meeting minutes for information regarding his right to teach at the Massachusetts Institute of Technology one day a week, a point of contention between Weaver and Altman. Weaver also reviewed Altman's and Del's employment agreements, which were kept in binders on a shelf in Lesher's office. Weaver was incensed to learn that Altman's and Del's contracts provided more generous terms than his. Weaver photocopied the contracts and took the copies.

A short time later, Weaver entered Altman's office on a weekend. He testified that he logged into Altman's e-mail account using Altman's password.[5] He searched Altman's e-mail account for e-mails including Weaver's name or initials and printed those that appeared relevant. Weaver entered Altman's office for the same purpose on between two and five other occasions. According to Weaver, on one occasion when he was in Altman's office (he testified that he does not remember exactly why he was there), he noticed a document in Altman's trash receptacle that included handwritten notes. Weaver retrieved the document and discovered that it was a printed copy of his 1999 employment agreement with hand-written changes—an apparent working draft of his proposed new employment agreement. Weaver either took the document or photocopied it and took the copy.

Weaver testified that he took one or two e-mails from Tallent's office. He stated that he did not log into her e-mail account, but that her computer was on and he noticed on the screen an open e-mail regarding his teaching responsibilities and his right to paid time off, which he printed. Weaver also obtained other e-mails by copying documents that had been printed from the "common printer," i.e., a printer in a common area that was connected to multiple company computers.

---

5. Weaver testified: "I knew his password. A lot of people knew his password."

In addition to the documents he took from the ZeniMax offices, Weaver stated that there were numerous e-mails that he reviewed but did not print or copy. He estimated that he had printed or copied only a small percentage of the e-mails he had read or skimmed.

Weaver testified that he had often entered, without prior permission, other executives' offices when they were not present. For example, he stated that he frequently entered Altman's office to obtain drinks from Altman's refrigerator. He stated that he had entered Lesher's office to review corporate documents, including Board meeting minutes. He had often entered those and other offices as necessary to obtain or drop off papers. Nevertheless, Weaver acknowledged that he had conducted his investigations at night and on weekends to hide his activities from ZeniMax. He conceded that he had lied to other ZeniMax employees about his actions [6] and that he had initially lied in his deposition. He also stated that, as Chief Technology Officer, he had "administrator rights" to access other employees' computers, but acknowledged that if he had done so, there would have been a record of such activities.

Weaver conceded that, shortly after he began his investigations, he hired counsel. In preparation for his deposition, he reviewed the various documents he had obtained. He had planned to reveal them to his counsel after Altman was deposed. He stated that he expected Altman to lie in his deposition and that the documents could be used as evidence of Altman's false testimony. He maintained that he had always intended to reveal the documents and produce them to ZeniMax.

ZeniMax called Weaver's counsel, Ronald Early, to testify. ZeniMax examined Early extensively regarding what he knew and when he knew it. Early repeatedly asserted Weaver's

---

6. In 2002, ZeniMax changed the locks. When Weaver learned that his "master key" no longer worked, he expressed his displeasure in an email to a number of ZeniMax employees, stating that he had "never violated the privacy of others."

attorney-client privilege, but he maintained that he found out about Weaver's activities at the same time as ZeniMax—during Weaver's deposition. Thereafter, Early insisted that Weaver had turned over all requested documents that were in his possession.

ZeniMax also called Lesher to testify. Lesher stated that he kept files in his office containing numerous corporate documents, that he locked his office every time he left it, and that he was unaware that Weaver had ever been in his office without permission. He stated that he never showed Weaver the binders in his office containing the Board meeting minutes and the executive employment contracts. Lesher testified that he recognized the document Weaver says he found in Altman's trash as a draft employment contract containing Altman's handwritten edits. Lesher said that he remembered last seeing the document in Weaver's employment file in Lesher's office and that he does not know how Weaver obtained it. Weaver's counsel cross-examined Lesher regarding various documents that ZeniMax asserted were privileged in an attempt to show that ZeniMax had suffered little prejudice as a result of Weaver's conduct.

The court took the matter under advisement, and issued an opinion on September 23, 2004, granting ZeniMax's motion to dismiss. The court noted that Weaver had read hundreds of e-mails and printed and copied some of them:

> During his incursions into [Altman's, Lesher's, Tallent's], and possibly other offices, Weaver scanned, at a minimum, hundreds of emails. While the Court finds his testimony highly self-serving and altogether unreliable, it does accept his admission that he did not copy or print out every message or file that he accessed. Nevertheless, the documents he eventually produced in discovery amount to nearly an entire ream of paper. The Court does acknowledge that some of these documents are duplicates of other messages contained within the collection itself. Rather than mitigate his conduct, the Court finds these duplicates merely underscore the diligence with which he pursued his goal of seeking all information which pertained to his personal

situation. He quite clearly used similar if not exact search terms in his computer assisted scanning of the email caches of each of his colleagues during each of his illicit incursions. . . .

The court found that Weaver undertook his investigation for the purpose of preparing for litigation, and therefore the fact that it took place prior to the onset of litigation was irrelevant:

There is no dispute that Weaver's conduct began during his employment and prior to the filing of his suit. The Court, however, is not convinced that this fact alone magically transforms this matter into a case of purely pre-litigation conduct. In fact, the Court is persuaded by the evidence that Weaver continued his course of illicit conduct specifically with the aim of obtaining materials that would be useful to him in future litigation with ZeniMax. From the evidence presented at the hearings the Court believes that Weaver fully anticipated filing suit against ZeniMax as early as October 2001 if his employment demands were not met. . . . This is quite simply civil vigilantism regardless of when the conduct began. It is the act alone that offends justice and the Court cannot rationalize such a perversion of its process because the initial actions first occurred prior to the filing of a suit.

* * *

The Court finds the plaintiff engaged in a systematic, calculated, and months-long scheme to obtain an advantage in a litigation that he planned to file and pursue. . . .

. . . [Weaver] admitted to reviewing [the documents he had printed] prior to his deposition and to planning to use them at a later date against Altman to gain a strategic litigation advantage.

It is also clear to the Court that Weaver, in spite of his rationalizations to himself and to this Court, was in fact aware that his conduct was wrongful. . . .

Lastly, at least one of the documents improperly viewed and retained by Weaver was relevant to the underlying litigation and would likely have been appropriately deemed

privileged, but for its disclosure through the plaintiff's illicit and improper actions. The document to which we refer is a copy of Weaver's employment contract with hand-written marginalia authored by Mr. Altman. At the hearing Weaver testified that he took this document from the trash can in Altman's office, though his assertions specifically regarding this document have been particularly prone to reassessment and rationalization. The comments written on the contract copy relate to the clauses that Altman believed should be changed in Weaver's upcoming contract. As the underlying matter in this litigation would revolve on the correct interpretation of Weaver's employment contract, Altman's notes and conclusions as the CEO would be highly probative of ZeniMax's position regarding key contract language. . . . . . [T]his document ought to have remained confidential and likely would have but for the wrongful conduct of Mr. Weaver.

The court recognized that no rule or statute gave it authority to sanction Weaver's actions. Nevertheless, the court asserted that it had inherent authority, in "extraordinary circumstances," to sanction such conduct: "As the defendant in this case asks the Court to act in this matter outside of the constraints of binding common or statutory law, the Court must initially reach the conclusion that such extraordinary circumstances are present which warrant the exercise of the Court's inherent authority to safeguard the integrity of its judicial process." The court found that Weaver's conduct constituted extraordinary circumstances:

[T]he Court unequivocally finds the plaintiff's conduct in this matter rises to the level of extraordinary circumstances. It is, thankfully, rare that a court confronts facts similar to the one at bar. Even viewed in a light most favorable to the plaintiff, Weaver's conduct clearly constitutes an unauthorized and improper intrusion into the offices, computers, files, email accounts, and trash bins of at least three ZeniMax employees. Alone this improper access would be extraordinary enough, but plaintiff compounded his error by printing, copying, and retaining a voluminous number of

these documents, and by referring to his ill-gotten gains both before and during the course of this litigation.

To determine the proper sanction for Weaver's extraordinary conduct, the court analyzed that conduct under a five-part framework:

I. *Did the plaintiff act willfully, wrongly, and in bad faith?*

Yes, the Court finds the plaintiff acted willfully, wrongly and in bad faith.

II. *Does an adequate nexus exist between the misconduct precipitating the motion for the dismissal sanction and the matters in controversy in the case?*

Yes, the Court finds Weaver's conduct was specifically motivated by his misguided desire to protect himself from any potential impropriety by ZeniMax and/or Mr. Altman in a litigation that at the time had not even been filed. To achieve this aim, Weaver sought to uncover damaging evidence which would provide him a strategic advantage in litigation. He attempted to unearth this information through his illicit incursions and improper acquisitions of hundreds of documents. As the matters in controversy in this case relate to a dispute over his personal employment contract, Weaver's very act of seeking such an advantage by illicit actions outside of the normal discovery procedures constitutes an adequate nexus over which the Court may exercise its inherent authority.

III. *Is the risk of prejudice to the party seeking sanctions impossible to discount absolutely or, alternatively is the taint this evidence would impart to the judicial process impossible to remove if permitted to be included in the plaintiff's case?*

Yes. In circumstances like these where the defendant has shown the plaintiff has engaged in improper conduct and gained access to confidential and possibly privileged materials and the precise scope of knowledge acquired by the plaintiff's improper conduct is not determinable, this Court believes prejudice must be presumed. Although

Weaver had an opportunity to overcome this presumption, we find he has failed to so. It is impossible to rule out completely the risk of prejudice to the defendant, because no one but Weaver knows for certain what information he has improperly reviewed and may still retain in his memory. He has admitted that the materials he has turned over to opposing counsel do not encompass everything he saw, reviewed, or accessed, as he only copied or printed select materials. Thus, this Court can never know the extent to which the evidence in this case has been tainted by his illicit actions. Without being able to assess how and to what extent evidence at trial would be tainted, this Court cannot craft a means to remove such taint at trial.

IV. *In the absence of sanctions would the promotion and safeguarding of the efficient and orderly administration of civil disputes be irrevocably undermined by the public policy favoring disposition of cases on their merits?*

Yes. Our judicial system is predicated upon the basis that disputes will be decided fairly and impartially, and that in general, decisions will be reached on the merits of the cases presented to the tribunal. While public policy strongly favors deciding cases on their merits rather than arriving at a final disposition on another basis, this Court cannot disregard the fact that Mr. Weaver by his actions consciously attempted to tamper with the efficient and orderly administration of this dispute. He now seeks to access this forum and requests the opportunity to present evidence to the fact finder. This Court, however, is unable to ignore the incongruity of permitting a litigant, who has attempted to thwart the fair and efficient administration of justice to further his own purposes, to seek to vindicate his interests in the same forum he has attempted to undermine. We find that sanctions in this matter are not only appropriate, but imperative to ensure the legitimacy and fairness of this Court's processes.

V. *Do no other lesser sanctions exist to account for and to deter this type of unilateral, self-help, and lawless behavior?*

Yes. This Court has concluded no sanction but dismissal exists to account for and deter the sort of premeditated, prolonged, and egregious conduct in which Mr. Weaver has engaged.

In response to the Court's inquiry regarding lesser sanctions, the plaintiff has advanced two alternatives. "One is to bar Mr. Weaver from utilizing some or all of the privileged documents which he obtained from Mr. Altman's computer. The other would be a monetary sanction. We believe any monetary sanction should be nominal under the circumstances of this case." The Court finds both of these proposals inadequate. Plaintiff's first suggested alternative only addresses the materials that Weaver has so far turned over to opposing counsel. It fails to remedy or protect against any taint in these proceedings stemming from information that Weaver may have seen but not hard copied. This remedy also fails to account for information that Weaver may have retained in his memory, from which he presumably could continue to benefit were the case to come to trial on the merits. Plaintiff's second alternative completely fails to address the taint. Furthermore, it incredibly suggests that one could buy himself out of the consequences of deliberate interference and subversion of the judicial process with a "nominal" sum.

\* \* \*

... Dismissal of this action is the only means at the disposal of this Court which adequately addresses the injury to both the defendant and to the integrity of judicial process itself which has been exacted by plaintiff's deliberate, lawless, and unilateral actions.

(Footnotes omitted.) The court issued an order dismissing Weaver's complaint with prejudice on September 23, 2004.

### ZeniMax's Claim for Fees and Expenses

Following the dismissal of Weaver's action, ZeniMax sought attorney's fees and litigation expenses based on discovery abuses by Weaver and bad faith litigation. The court held a hearing on May 5, 2005. On July 26, 2005, the court granted

attorney's fees to ZeniMax in the amount of $75,000, and expenses in the amount of $1,849.44, explaining:

> This Court's basis for imposition of sanctions has been fully stated. It remains for the Court to decide what, in addition to the dismissal of Weaver's claim, is necessary for remediation. The claim brought by Weaver, if fully proven without misconduct, could have resulted in a verdict of approximately $3,750,000.00. The striking of the claim constitutes a significant benefit and remediation to ZeniMax. It is purely speculative to guess at the potential outcome of a lawsuit for which there has been no evidentiary hearing. The dismissal o[f] Weaver's claim, without it being fully litigated, represents a significant benefit to ZeniMax, whether or not attorney fees are even awarded. This action eliminates the necessity of ZeniMax to bear the cost of defending a claim, which on its face, was colorable. Thus in determining the amount of attorney fees expended on the sanctioned conduct, this Court should take into account the required expenditure of time and effort occasioned by the wrongful conduct and balance this factor against that which might have been expended had the wrongful conduct never occurred.
>
> ... [T]he sanctioned conduct was discovered early, thereby undoubtedly forestalling much that would otherwise have been required in preparation for trial. Consequently, it is arguable that ZeniMax saved expenses that it would otherwise have incurred by the misconduct of Weaver.
>
> * * *
>
> ... While the gravity of the conduct and the uniqueness of the issue are important, it is this Court's belief that a conservative, remedial award of attorney fees should be $75,000.00 from Weaver to ZeniMax. In addition to those fees, ZeniMax should be awarded further the sum of $1,849.44 for expenses.

### Summary Judgment on ZeniMax's Counterclaims

ZeniMax's counterclaims remained before the court. ZeniMax voluntarily dismissed count 1 of its counterclaim, breach

of fiduciary duty of care. Count 2 was for breach of contract. In its amended counterclaim, ZeniMax alleged that Weaver had breached the employment agreement by (1) failing to devote his full time and effort to the company, (2) taking vacation time in excess of that allowed by the contract, (3) wrongly receiving payment for time in which he did not work, (4) surreptitiously entering ZeniMax offices and obtaining confidential information, and (5) attempting to solicit another ZeniMax employee to leave the company and start a new, competing business. ZeniMax sought "damages (including interest and applicable taxes) sustained by it resulting from Weaver's breach of contract[ ], including a recovery of salary and all benefits paid to Weaver after his first breach." Both parties moved for summary judgment on count 2. The court held a hearing January 13, 2005.

In support of its motion for summary judgment, ZeniMax asserted that the facts of Weaver's conduct in entering other executives' offices and obtaining confidential information were undisputed. ZeniMax argued that Weaver's conduct constituted "the commission of an act involving fraud in the course of the performance of Executive's duties" under section 4.2(b)(i) of the employment agreement, and made him subject to termination for cause. ZeniMax also mentioned that Weaver's actions were in violation of section 1.1 of the agreement, which required that he "devote his full time and efforts to the business of the Company."

Weaver argued that he could not be subject to disgorgement of compensation based on "after-acquired evidence" of terminable conduct when he had not actually been terminated for violations under section 4.3. He further contended that his actions did not constitute "fraud," nor were they "in the course of the performance of [his] duties."

The circuit court found Weaver breached the contract:

As to Count 2, I totally disagree with plaintiff's position. It is the Court's belief that the conduct of the plaintiff is such that it was violative of his agreement of employment. And by breaching his agreement of employment, he is not

entitled to recover. So I grant defendant's, as a matter of law, the defendant's motion under Count 2.

In an order dated August 26, 2005, the court denied Weaver's motion for partial summary judgment on count 2, and granted ZeniMax's motion for summary judgment on that count. The court further ordered that Weaver "therefore was not entitled to recover any further payments under his Executive Employment Agreement after the termination of his employment."

As for count 3, ZeniMax alleged in its amended counterclaim that Weaver's conduct constituted a violation of his fiduciary duty of loyalty to the corporation. According to ZeniMax, "Weaver used his corporate office for personal gain and betrayed the trust of his fellow ZeniMax officers and the Company." ZeniMax averred that Weaver, by his conduct, breached his employment agreement and committed criminal violations. ZeniMax reasoned that, had Weaver been caught after his first act, he would have been terminated and could not have brought the present actions. Thus, ZeniMax suffered damages by having to defend against Weaver's suit. ZeniMax sought recovery of compensation paid to Weaver during the period of his surreptitious activities, and litigation costs. The court considered the parties' competing motions for summary judgment at the January 13, 2005 hearing.

ZeniMax argued that actions by a corporate officer in furtherance of his personal interests, to the detriment of the corporation, constitutes a breach of the officer's duty of loyalty to the corporation. ZeniMax contended that Weaver's actions caused damages to the corporation and that he should not be permitted to escape with the dismissal of his case as the only penalty. ZeniMax urged the court to use its powers of equity to force disgorgement of Weaver's compensation and award attorney's fees and litigation costs.

Weaver responded that ZeniMax had failed to demonstrate damages as a result of his acts. He further contended that disgorgement is not a proper remedy for his conduct under Delaware law.

At the conclusion of the January 13, 2005 hearing, the court granted Weaver's motion for summary judgment on count 3, finding that ZeniMax had not shown damages:

I am satisfied that under the third count, fiduciary duty of loyalty, that the plaintiff's motion ... should be granted.

I agree that the loss of the corporation cannot be proven in the sense that it evolves into really attorney's fees, which I intend to cover in another fashion. So that Count 3, I think that ZeniMax has failed to demonstrate an ability to recover on that count, and as a result it will be dismissed.

In an order dated November 18, 2005, the court granted Weaver's motion for summary judgment on count 3, and denied ZeniMax's motions for summary judgment on that count. The court further ordered "that summary judgment is entered in favor of Plaintiff/Counter–Defendant on Count III of the First Amended Counterclaim and that Count is DIS-MISSED with PREJUDICE."

### Appeal

Weaver noted an appeal on December 15, 2005; ZeniMax noted its cross-appeal on December 27, 2005.

## DISCUSSION

### I. Dismissal of Weaver's Action

Under the Maryland Rules, a circuit court has authority to sanction improper conduct by a litigant. *See* Md. Rule 2–433 (permitting sanctions, including dismissal, for discovery failures). As the circuit court recognized, no rule or statute provides for dismissing a case or sanctioning a plaintiff for improperly seeking and obtaining evidence prior to the commencement of the litigation.

Nevertheless, a circuit court's authority is not limited to that provided in the rules or by statute. Maryland Rule 1–201(c) provides: "Neither these rules nor omissions from these rules supersede common law or statute unless inconsistent with these rules." As the Court of Appeals recently

reiterated: "Since the early years of the Republic, Maryland courts have recognized the inherent authority of courts in numerous contexts." *Wynn v. State,* 388 Md. 423, 431–32, 879 A.2d 1097 (2005). *See, e.g., id.* at 437, 879 A.2d 1097 (noting the circuit court's inherent authority to sanction a party for failure to comply with a scheduling order); *In re Ann M.,* 309 Md. 564, 568, 525 A.2d 1054 (1987) (stating that "the contempt powers of Maryland courts generally exist independent of statute"); *Wilson v. N.B.S., Inc.,* 130 Md.App. 430, 451, 746 A.2d 966 (2000) (affirming the circuit court's use of its inherent authority to dismiss a plaintiff's case as a sanction for refusing to undergo a court-ordered examination); *Klupt v. Krongard,* 126 Md.App. 179, 196–97, 728 A.2d 727 (1999) (holding that the circuit court had properly used its inherent authority to dismiss the defendant's counterclaim as a sanction for destroying evidence that was the subject of a request for production). *See also Chambers v. NASCO, Inc.,* 501 U.S. 32, 42–51, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (discussing the inherent authority of federal district courts). The Court of Appeals has explained the general nature of inherent judicial authority:

> The judicial branch of government in this State possesses those powers expressly reserved to it by the Maryland Constitution and Declaration of Rights. In addition, the judiciary has certain implied or inherent powers under the Maryland Constitution.... "In order to accomplish the purposes for which they are created, courts must also possess powers. From time immemorial, certain powers have been conceded to courts, because they are courts. Such powers have been conceded, because without them they could neither maintain their dignity, transact their business, nor accomplish the purposes of their existence. These powers are called inherent powers. * * *
>
> 'The inherent power of the court is the power to protect itself; the power to administer justice ...; the power to promulgate rules for its practice; and the power to provide process where none exists. It is true that the judicial power of this court was created by the Constitution, but, upon

coming into being under the Constitution, this court came into being with inherent powers.' "

*Comm'n on Med. Discipline v. Stillman*, 291 Md. 390, 400–01, 435 A.2d 747 (1981) (quoting *State v. Cannon*, 196 Wis. 534, 221 N.W. 603, 603–04 (1928); quoting in turn, *In re Bruen*, 102 Wash. 472, 172 P. 1152, 1153 (1918)).

■ In *Klupt*, we indicated that a circuit court has inherent authority to sanction conduct that occurred prior to the commencement of the litigation. In that case, we determined that the circuit court had inherent authority to sanction a defendant who had destroyed evidence that was the subject of a request for production. We recognized four prerequisites to a trial court's sanctioning spoliation of discoverable evidence and suggested that prelitigation spoliation could be subject to sanction:

"(1) An act of destruction;

(2) Discoverability of the evidence;

(3) An intent to destroy the evidence;

(4) Occurrence of the act at a time after suit has been filed, *or, if before, at a time when the filing is fairly perceived as imminent.*"

*Klupt*, 126 Md.App. at 199, 728 A.2d 727 (quoting *White v. Office of the Public Defender of the State of Maryland*, 170 F.R.D. 138, 147 (D.Md.1997)) (emphasis added).

Federal courts have directly addressed the issue of a plaintiff's improperly obtaining evidence in preparation for litigation, and the proper sanction for such conduct. In *Jackson v. Microsoft Corp.*, 211 F.R.D. 423 (W.D.Wash.2002), a former Microsoft employee had brought suit for various civil rights violations. In discovery, Jackson acknowledged having stolen a number of internal documents both before and after he left Microsoft. The federal district court granted Microsoft's motion to dismiss based on Jackson's misconduct. The court listed several factors that are relevant to the decision whether to dismiss a plaintiff's case, and stated that " 'the key factors' " to consider regarding the sanction of dismissal " 'are prejudice and the availability of lesser sanctions.' " *Id.* at 431 (quoting

*Wanderer v. Johnston,* 910 F.2d 652, 656 (9th Cir.1990)). The court further explained:

> For dismissal to be proper, the conduct to be sanctioned must be characterized by "willfulness, fault, or bad faith." *Anheuser–Busch,* 69 F.3d at 348 (internal citations omitted). "Due process concerns further require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the case.'" *Id.* (quoting *Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 591 (9th Cir.1983)).

*Jackson,* 211 F.R.D. at 431.

The court summarized the relationship between Jackson's conduct and the litigation, and the prejudice to Microsoft, as follows:

> [E]ven assuming that Mr. Jackson has now returned all purloined documents, the damage to Microsoft has been done. Mr. Jackson clearly spent considerable time and attention reading and referring to the items at issue. He sent selected copies to his attorneys, and discussed the documents with at least two additional people. Mr. Jackson's knowledge of Microsoft's proprietary information cannot be erased. Some of this proprietary information goes directly to the heart of this litigation. Mr. Jackson had in his possession for ten months memoranda in which Microsoft management discussed with one another, and with counsel, the manner in which they would choose to respond to Mr. Jackson's allegations of mistreatment by Microsoft. Mr. Jackson also had in his possession for ten months documents regarding the evaluation and compensation of other Microsoft employees. Microsoft has suffered prejudice which can only be cured by dismissal.

*Id.* at 432.

In *Fayemi v. Hambrecht & Quist, Inc.,* 174 F.R.D. 319 (S.D.N.Y.1997), Fayemi had entered the employer's offices after his dismissal and obtained documents from his supervisor's computer. The documents later served as a basis for his

wrongful termination case against the employer. His possession of the documents came to light during discovery, and the employer moved for dismissal. The federal district court explained its inherent authority to sanction Fayemi's conduct:

[C]ourts necessarily have the inherent equitable power over their own process "to prevent abuses, oppression and injustices." *Gumbel v. Pitkin,* 124 U.S. 131, 144, 8 S.Ct. 379, 383, 31 L.Ed. 374 (1888). Pursuant to this inherent authority, a court must be able to sanction a party that seeks to introduce improperly obtained evidence; otherwise the court, by allowing the wrongdoer to utilize the information in litigation before it, becomes complicit in the misconduct.

* * *

Rule 26(c) ... does not provide authority for regulating the use of information obtained by a party independent of the discovery process. A court may, however, exercise its inherent equitable powers to sanction a party that seeks to use in litigation evidence that was wrongfully obtained.

*Fayemi,* 174 F.R.D. at 324–25 (citations omitted).

As to "[t]he appropriate sanction to impose on a party that has wrongfully obtained evidence," the court stated that it would consider "the severity of the wrongdoing and the prejudice to the adversary." *Id.* at 325. The court noted that "[m]atching the sanction to any prejudice suffered by the adversary is important because the party's wrongful acquisition of evidence should not be permitted to redound to its benefit in the litigation." *Id.* The court determined that dismissal was inappropriate:

Mr. Fayemi's conduct in this case was clearly wrongful. . . .

However, dismissal with prejudice is a "drastic remedy that should be imposed only in extreme circumstances." *Salahuddin v. Harris,* 782 F.2d 1127, 1132 (2d Cir.1986). Here there is little, if any, continuing prejudice to the defendants. This is not a case ... where the disclosure of privileged material provided the wrongdoer with information that she would not have otherwise obtained and could not be "unlearned." *Lipin,* 84 N.Y.2d at 572–73, 620

N.Y.S.2d at 748, 644 N.E.2d at 1304–05. On the contrary, the bonus data, though confidential, would certainly have been subject to disclosure during the normal course of discovery. Accordingly, there is no prejudice to the defendants sufficient to warrant dismissal.

The alternative remedy sought by the defendants is an order precluding the plaintiff from using in this litigation the bonus information wrongfully obtained. This sanction is more appropriate. It would prevent the plaintiff from benefitting from his wrongdoing and it is sufficient to ameliorate any prejudice to the defendants. Accordingly, an order of preclusion is the proper remedy.

*Fayemi,* 174 F.R.D. at 325–26 (citations omitted). The court ultimately rejected the preclusion remedy based on unclean hands, because the employer had destroyed the discoverable documents before it was aware that Fayemi had obtained them by improper means.

Based on Maryland case law recognizing the inherent authority of trial courts to sanction litigants for improper conduct, and finding guidance in federal case law applying such inherent authority to prelitigation gathering of evidence, we are satisfied that a circuit court has inherent authority to sanction conduct like Weaver's in this case. In our view, it is within the discretion of the circuit court to sanction an offending party as necessary to remedy prejudice to the other side or to safeguard the court's ability to properly adjudicate the case. The more difficult question is what is the appropriate sanction?

Dismissal is clearly the ultimate sanction and there is always "a preference for a determination of claims on their merits." *Holly Hall Publ'ns, Inc. v. County Banking and Trust Co.,* 147 Md.App. 251, 267, 807 A.2d 1201 (2002). The rules and the courts "do not favor imposition of the ultimate sanction absent clear support." *Id.* The Court of Appeals has said:

The dismissal of a claim ... is among the gravest of sanctions, and as such, is warranted only in cases of egre-

gious misconduct such as "wil[l]ful or contemptuous" behavior, "a deliberate attempt to hinder or prevent effective presentation of defenses or counterclaims," or "stalling in revealing one's own weak claim or defense."

*Manzano v. S. Maryland Hosp., Inc.*, 347 Md. 17, 29–30, 698 A.2d 531 (1997) (quoting *Rubin v. Gray*, 35 Md.App. 399, 400–01, 370 A.2d 600 (1977)) (other citations omitted).

█ The circuit court in this case relied principally on *Jackson* and several cases involving plaintiffs who had improperly obtained documents during the discovery process. *See Perna v. Electronic Data Sys. Corp.*, 916 F.Supp. 388 (D.N.J. 1995) (dismissing contract enforcement action after plaintiff, during a lunch break in a discovery conference, obtained and copied documents that fell from opposing counsel's briefcase); *Lipin v. Bender*, 193 A.D.2d 424, 597 N.Y.S.2d 340 (N.Y.App. Div.1993) (affirming dismissal after plaintiff, during a discovery conference, obtained and copied internal memoranda prepared by opposing counsel). We are not persuaded that Weaver's conduct rises to the level of the conduct in those cases with regard to the relationship between his conduct and the merits of the case, or with respect to the prejudice to ZeniMax. It is more like *Fayemi*, where the documents obtained by the plaintiff were discoverable and did not give the plaintiff an unfair advantage in the litigation.

In this case, most of the relevant documents obtained by Weaver were discoverable and were produced in discovery after Weaver revealed that he already possessed them. Some documents, including the draft contract, although relevant, were likely not discoverable. In our view, the documents obtained by Weaver outside the discovery process did not prejudice ZeniMax's defense of the case or the court's adjudication of the case to the degree that outright dismissal of Weaver's claims was warranted.

We are also not persuaded that any knowledge gained by Weaver from reading e-mails or documents that he did not print or copy will cause substantial prejudice to ZeniMax or the judicial process. As he was seeking to obtain evidence

regarding his disputes with ZeniMax executives, it was in his interest to print and copy all materials that he believed to be helpful. To that end, he would have printed or copied any materials that appeared relevant to him.

The court was obviously concerned about any unfair advantage Weaver could gain from his prelitigation investigation that was not revealed by the documents that had been produced, i.e., "seen[,] but not hard copied," and any "information that Weaver may have retained in his memory, from which he presumably could continue to benefit were the case to come to trial on the merits."

We are not persuaded that the risk of unfair advantage is as great as the circuit court perceived. If ZeniMax or the circuit court suspect that Weaver is using information that he gained through improper prelitigation conduct, but which is not reflected in the documents produced, the court may conduct an inquiry into the matter and address the issue at that time.

Under the circumstances of this case, we are persuaded that the circuit court's dismissal of Weaver's case was an abuse of its discretion, as his conduct and the implications of that conduct are not so egregious as to warrant the ultimate sanction. Accordingly, we shall vacate the judgment of the circuit court and remand the case for further proceedings.

## II. Fees and Expenses

Both parties challenge the court's award of attorney's fees. Because we are vacating the court's dismissal of Weaver's actions and remanding for further proceedings, we shall vacate the award of attorney's fees and costs.

## III. ZeniMax's Counterclaim

The court granted summary judgment in favor of ZeniMax on its breach of contract claim, and granted summary judgment in favor of Weaver on ZeniMax's breach of duty of loyalty claim. Maryland Rule 2–501(f) states that the circuit court may grant summary judgment "if the motion and response show that there is no genuine dispute as to any

material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Accordingly, "[w]hen reviewing a grant of summary judgment, we first determine whether a genuine dispute of material fact exists." *Mitchell v. Baltimore Sun Co.,* 164 Md.App. 497, 507, 883 A.2d 1008 (2005), *cert. denied,* 390 Md. 501, 889 A.2d 418 (2006).

"If we determine that no genuine issue of material fact is present, then we must decide 'whether the [trial] court reached the correct legal result.'" *Crews v. Hollenbach,* 126 Md.App. 609, 625, 730 A.2d 742 (1999), *aff'd,* 358 Md. 627, 751 A.2d 481 (2000) (quoting *Chicago Title Ins. Co. v. Lumbermen's Mut. Cas. Co.,* 120 Md.App. 538, 547, 707 A.2d 913 (1998)). In so doing, "[t]his Court reviews the same material from the record and decides the same legal issues as the circuit court." *Lopata v. Miller,* 122 Md.App. 76, 83, 712 A.2d 24 (1998). "In making our analysis, we do not accord deference to the trial court's legal conclusions." *Id.*

Generally, we may affirm a circuit court's grant of summary judgment only on the grounds relied upon by the circuit court. *PaineWebber Inc. v. East,* 363 Md. 408, 422, 768 A.2d 1029 (2001). "[W]e will not speculate that summary judgment might have been granted on other grounds not reached by the trial court." *Gresser v. Anne Arundel County,* 349 Md. 542, 552, 709 A.2d 740 (1998).

## A. Breach of Contract

Weaver acknowledged engaging in the conduct that ZeniMax contends was a breach of the employment agreement. Whether a party to a contract breached the terms of the contract is generally a question of fact because it is for the fact finder to decide between conflicting evidence regarding the party's conduct with respect to the contract. 23 Richard A. Lord, *Williston on Contracts* § 63:15 (4th ed., Supp. 2006). If the facts are undisputed, however, it is for the court to decide whether those facts constitute a breach of the contract. *Id.* Indeed, the interpretation of a written contract is a

question of law for the court to resolve. *Maslow v. Vanguri,* 168 Md.App. 298, 317, 896 A.2d 408 (2006).

■ On appeal, we owe no deference to the circuit court's interpretation of a contract; we review that interpretation *de novo* and arrive at our own conclusion as to the meaning of the contractual language. *Id.* In this case, therefore, we shall review *de novo* the circuit court's interpretation of the employment contract and its determination that Weaver's admitted conduct constituted a breach of the terms of that contract.

■ Our goal in interpreting the contractual language is "to ascertain and effectuate the intention of the contracting parties." *Maslow,* 168 Md.App. at 317, 896 A.2d 408. The Courts of this State have long held that the proper way to find and apply the intention of the parties is to read the contractual language objectively. *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC,* 376 Md. 157, 166, 829 A.2d 540 (2003). Hence, we initially look only to the language of the contract, " 'giv[ing] effect to its plain meaning' " and refraining from " 'delv[ing] into what the parties may have subjectively intended.' " *Eller v. Bolton,* 168 Md.App. 96, 116, 895 A.2d 382 (2006) (quoting *Rourke v. Amchem Prods., Inc.,* 384 Md. 329, 354, 863 A.2d 926 (2004)). In addition, we consider " ' "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." ' " *United Servs. Auto Assoc. v. Riley,* 393 Md. 55, 80, 899 A.2d 819 (2006) (quoting *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358 (1999); quoting in turn *Pac. Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 388, 488 A.2d 486 (1985)). "Moreover, contracts are interpreted 'as a whole to determine parties' intentions.' Similarly, a disputed term must be considered in context." *Phoenix Servs. Ltd. P'ship v. Johns Hopkins Hosp.,* 167 Md.App. 327, 392–93, 892 A.2d 1185 (2006) (quoting *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 508, 667 A.2d 617 (1995)). If the language of a contract is unambiguous, we consider it conclusive as to the intent of the parties. *Middlebrook Tech, LLC v. Moore,* 157 Md.App. 40, 66, 849 A.2d 63 (2004).

A breach of contract is generally defined as "a failure, without legal excuse, to perform any promise that forms the whole or part of a contract." *Williston, supra* at § 63:1. *Accord String v. Steven Dev. Corp.*, 269 Md. 569, 579, 307 A.2d 713 (1973); *Weiss v. Sheet Metal Fabricators, Inc.*, 206 Md. 195, 203, 110 A.2d 671 (1955). A "promise," as that term is used in the law of contracts, is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Contracts § 2(1) (1981). *See also Goldstein v. Miles*, 159 Md.App. 403, 430–31, 859 A.2d 313 (2004) (defining "promise").

In granting summary judgment, the circuit court stated: "It is this Court's belief that the conduct of the plaintiff is such that it was violative of his agreement of employment." We understand "the conduct of the plaintiff" as referring to Weaver's actions in surreptitiously obtaining e-mails and documents, because that is the only conduct relied upon by ZeniMax in support of summary judgment. Furthermore, ZeniMax asserted only that Weaver's conduct breached sections 4.2 ("Termination by the Company with Cause") and 1.1 ("Duties and Status") of the agreement. Thus, we will limit our review of the grant of summary judgment to whether Weaver's actions constituted a breach of those sections of the employment agreement.

Weaver contends that the circuit court erred in granting summary judgment to ZeniMax on breach of contract. He points out that section 4.2(b)(i) of the employment agreement provided for termination for cause in the event of "the commission of an act involving fraud *in the course of the performance of Executive's duties.*" (Emphasis added.) According to Weaver, "[t]he requirement that an act be performed within the course of an employee's duties is tantamount to a requirement that the act be performed within the scope of his employment." Weaver discusses at length the tort doctrine of "scope of employment," and contends that his acts fell outside the scope of his employment. He further asserts that his

conduct did not constitute a breach of his implied duty of loyalty to the corporation, and therefore he was not terminable on that basis. He also states that he was within his rights as a corporate officer to view company documents. Weaver further argues that, even if his conduct constitutes a breach of his contract, that breach was not material and thus did not warrant termination. Even if a breach is assumed, materiality is generally a question of fact, *Williston, supra* at 63:3, which cannot be decided on summary judgment. Md. Rule 2–501(a).

ZeniMax asserts that, under section 4.2 of the employment agreement, "Weaver was required to refrain from fraud in the course of performing his duties," and that the contract includes an implied duty of loyalty to the corporation. According to ZeniMax, "[t]here can be no doubt that Weaver's misconduct [in obtaining the various documents] breached both of these duties." ZeniMax further contends that Weaver's "breaches" were material and caused harm to the corporation because his actions were adverse to the company's legal interests. ZeniMax denies that Weaver was authorized to view the documents he obtained.

As noted, section 4.2 of the employment agreement states in relevant part:

(a) In the event the Company terminates the Executive's employment under this Agreement on or before the Employment Term, with Cause, the Executive will be not be [sic] entitled to any further compensation or benefits after the date of termination. . . .

(b) For purposes of this Section 4 "Cause" shall mean (i) the commission of an act involving fraud in the course of the performance of Executive's duties, (ii) intentional material damage to the property or business of the Company and (x) such damage has not immediately ceased and (y) such damage had not been cured by Executive within twenty-one (21) days following the receipt of written notice by the Executive from the Board of Directors specifying the action causing damage and demanding cessation of such action and cure of such damage, (iii) the conviction of the Executive of

a crime constituting a felony, (iv) conduct that constitutes a material breach of this Agreement, subject to the Executive's right to cure such conduct within twenty-one (21) days following receipt of written notice to the Executive by the Board of Directors specifying such breach, or (v) continuance of failure by the Executive to perform his duties in accordance with this Agreement after receipt of written notice to the Executive by the Board of Directors specifying such failure and such failure has not been cured within twenty-one (21) days following the receipt of such notice by the Executive; *provided, however,* that in any case such "Cause" shall not be found to exist absent a unanimous vote of the non-interested members of the Board of Directors.

These provisions of the contract set forth grounds for termination. That is, they specify that if Weaver acts or refrains from acting in certain ways, he is subject to termination for cause. It is undisputed, however, that Weaver was not terminated for cause. To the contrary, the contract expired and he did not enter into the new contract that ZeniMax offered to him. The conduct complained of was not known to ZeniMax prior to the litigation.

Section 1.1(b) of the employment agreement provides in relevant part:

During the Employment Period, the Executive shall (i) devote his full time and efforts to the business of the Company and will not engage in consulting work or any trade or business for his own account or for or on behalf of any other person, firm or Company which competes or conflicts or interferes with the performance of his duties hereunder in any way. . . .

There are allegations in the complaint that Weaver devoted too much time to his teaching duties, and that he attempted to persuade another ZeniMax employee to join him in founding a new, competing company. Facts supporting these allegations are in dispute and it does not appear that ZeniMax relied on these allegations in seeking summary judgment.

In our view, therefore, the circuit court erred in granting summary judgment based on a breach of sections 1.1(b) and 4.2 of the contract. We shall therefore vacate the court's grant of summary judgment on ZeniMax's breach of contract counterclaim.

### B. Breach of Duty of Loyalty

As the Court of Appeals recently explained: " '[T]he internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.' " *Storetrax.com, Inc. v. Gurland,* 397 Md. 37, 52, 915 A.2d 991 (2007) (quoting *Edgar v. MITE Corp.,* 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)). The internal affairs doctrine likewise applies to a dispute between a corporation and a former officer or director where no third-party rights are involved. *Resolution Trust Corp. v. Camhi,* 861 F.Supp. 1121, 1126–27 (D.Conn.1994). Thus, Delaware law applies to ZeniMax's breach of duty of loyalty claim.

The duty of loyalty doctrine is rooted in public policy and meant to protect shareholders from self-interested directors and officers:

"Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. . . . A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an

undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest." *In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693, 751 (Del.Ch.2005) (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del.1939)).

A corporate director's or officer's duty of loyalty to the corporation is broad:

The duty of loyalty takes no canonical form. It is as complex as corporate interests and officer temptations and means of descent from grace. It partakes of the objective as well as the subjective....

[A]n undivided loyalty to the corporation demands that there shall be no conflict between duty and self-interest. Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. Thus, officers and directors must exert all reasonable and lawful efforts to ensure that the corporation is not deprived of any advantage to which it is entitled.

William Meade Fletcher, *Cyclopedia of the Law of Corporations* § 837.60 (2006).

Courts and commentators have stated that the issue of whether a corporate director or officer breached his or her duty of loyalty to the corporation is a question of fact. *Willens v. 2720 Wisconsin Ave. Co-op. Ass'n, Inc.*, 844 A.2d 1126, 1136 (D.C.2004); *Northeast Harbor Golf Club, Inc. v. Harris*, 725 A.2d 1018, 1025 (Me.1999); Fletcher, *supra*, at 837.60. The Supreme Court of Delaware has opined that the question of whether a director or officer "breached his fiduciary duty of loyalty involves both a question of law and a question of fact," but that the issue is " 'fact dominated.' " *Broz v. Cellular Information Sys., Inc.*, 673 A.2d 148, 154 (Del.1996) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del.1993)).

If a claimant demonstrates a breach of the fiduciary duty of loyalty, a wide range of remedies are available at the discretion of the court. *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 175 (Del.2002). These

include compensatory damages, punitive damages, and equitable relief. *Id.*; Fletcher, *supra* at § 860.50.

Here, the circuit court did not directly address the issue of whether Weaver's conduct actually constituted a breach of his fiduciary duty of loyalty to ZeniMax. Instead, the court concluded that ZeniMax would be unable to prove damages, other than litigation fees and costs that the court intended to award under Rule 1–341, and granted Weaver's motion for summary judgment and denied ZeniMax's motion.

ZeniMax contends that the circuit court erred because "recoverable loss" is not an element of a breach of duty of loyalty claim. ZeniMax asserts that Weaver clearly breached his duty of loyalty, and that the court could have awarded a number of remedies, including nominal damages, a declaration that Weaver is not entitled to severance pay, the costs of defending against Weaver's suit, and disgorgement of salary paid during the time period of the breach. Furthermore, ZeniMax states that, under the contract, it was required to advance Weaver's reasonable litigation fees and costs. It contends that, because his suit was brought in bad faith, the "advancement of fees did constitute financial injury, if injury was required for judgment on the breach of fiduciary duty count." ZeniMax further complains that the court's ruling appears to be a judgment on the merits that Weaver did not breach his duty of loyalty, and therefore ZeniMax is unable to recover the litigation fees it advanced.

Weaver counters that ZeniMax did not request nominal damages before the circuit court. He further contends that nominal damages are not appropriate for a breach of the duty of loyalty. Weaver also argues that, because ZeniMax failed to show monetary injury as a result of Weaver's alleged breach, it was not entitled to disgorgement of his salary. With respect to ZeniMax's claim for litigation fees and costs as damages for breach of fiduciary duty, Weaver contends that his suit was not in bad faith, nor was his conduct so egregious as to justify damages in the amount of ZeniMax's attorney's fees and costs.

 Considering the "fact dominated" nature of the claim, we are persuaded that the circuit court erred in granting summary judgment. Only after all material facts are resolved and applied to the relevant law can it be determined whether a duty of loyalty to the corporation has been breached and an appropriate remedy be awarded. We shall therefore vacate the circuit court's grant of summary judgment and remand for further proceedings on ZeniMax's breach of duty of loyalty claim.

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID 1/3 BY APPELLANT/CROSS–APPELLEE AND 2/3 BY APPELLEE/CROSS–APPEL-LANT.**