REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1059

September Term, 2014

_____

KAREN KUNDA

v.

WILLIAM MORSE, ET UX.

_____

Graeff,
Kehoe,
Reed

JJ.

_____

Opinion by Reed, J.

_____

Filed: August 31, 2016

The small business at the heart of this appeal is the source of a rather large dispute. Karen Kunda, appellant, entered into a contract with William and Sharon Morse, appellees, for the sale and transfer of the Hacks Point General Store and associated property. As part of the transaction, Ms. Kunda agreed to finance a portion of the sale price. Difficulties arose with repayment of the loan and the transaction broke down into accusations of breach of contract. The Morses filed their complaint against Ms. Kunda in the Circuit Court for Cecil County and, after a bench trial, emerged victorious on their breach of contract claim. Based on its factual findings, the trial court awarded the Morses $200,000 in damages, an amount greater than the $102,600 originally requested in the complaint. Ms. Kunda quickly noted her appeal to this Court.

Ms. Kunda presents two questions for our review,[1] which we rephrase as follows:

    I.    Did the trial court err when it determined that appellant breached the contract?

    II.    Did the trial court err in its calculation of economic damages?

We answer both of these questions in the negative and, therefore, affirm the trial court's order.

### FACTUAL AND PROCEDURAL BACKGROUND

---

[1] Ms. Kunda originally presented her questions to this Court as follows:

    1.  Was the court in error in determining that Appellees had not first breached the contract? Was the court in error in determining that Appellant breached the contract?

    2.  Was the court in error in its calculation of economic damages?

Karen Kunda, appellant, entered into an agreement to transfer her small business, the Hacks Point General Store, Inc. ("Hacks Point"), and associated real property to William and Sharon Morse, appellees. Hacks Point is a small general store near the waterfront of the Bohemia River in Earleville, Maryland. Ms. Kunda was the sole shareholder of Hacks Point and holder of the store's liquor license. Although Hacks Point was ostensibly a general store, a major source of the business' revenue was slot machines of questionable legality. With the slot machines, the business allegedly brought in approximately $8,000 per week.

With an eye, perhaps, toward the advantages of this revenue stream, the Morses entered into a contract (the "agreement") with Ms. Kunda on September 29, 2007, to buy the Hacks Point business and property. Per the agreement, the Morses would purchase the general store building, the adjacent residence, and 99 out of 100 shares of corporate stock for a total of $846,950.[2] The financing provision of the sale agreement stated that the Morses would obtain financing in the amount of $622,000, and Ms. Kunda would provide a loan in the amount of $224,950 to be paid back over 240 months with 8% interest.

The agreement also stated that, pending full repayment of the debt, all shares of the corporation would be placed in a voting trust with Ms. Kunda serving as trustee. She would vote the shares of the corporation to elect the Morses as directors of Hacks Point. In the event of default, however, the shares would be voted as directed by Ms. Kunda.

---

[2] Ms. Kunda would retain one share of stock, and the Morses had the option, upon repayment of the full debt obligation, to purchase the final share for the price of $1.00.

Settlement was scheduled for October 4, 2007, but the Morses could not arrange for bank financing in that short time-span. The parties agreed in an addendum to the original sale agreement that settlement would take place on May 1, 2011. The addendum required the Morses to make a $100,000 deposit with Ms. Kunda on the date the parties signed the addendum, October 21, 2007. It further required a second deposit of $174,950, either in full or by monthly installments, by June 1, 2008. In addition to the deposits, the addendum required the Morses to pay $4,500 monthly as lease payments to Ms. Kunda.

According to Ms. Kunda's trial testimony, the Morses paid the initial $100,000 required by the sale addendum approximately one week after signing that document, on or about October 29, 2007. The Morses then paid approximately $100,000 for the second deposit in June 2008. According to Ms. Kunda, she agreed to amortize the remaining $74,950 over a two-year period.

In June of 2010, the Morses defaulted on the remaining $74,950 debt obligation. Per the voting trust recital of the agreement, Ms. Kunda voted the shares to re-establish herself as director, as well as president, vice president, and secretary of Hacks Point. She then issued a notice to the Morses indicating that they were no longer directors of the corporation, and that they were no longer permitted on the premises.

The Morses filed their complaint with the trial court on December 29, 2010. In it, they alleged several counts of breach of contract against both Ms. Kunda and the corporation. The breaches allegedly arose from Ms. Kunda's failure to return the approximately $100,000 paid for the store's stock; her preventing the Morses from completing their purchase of Hacks Point; and her failure to disclose the illegality of the

3

slot machines. Ms. Kunda and the corporation answered the complaint on June 30, 2011, and countersued on July 29, 2011.

In the counter-complaint, Ms. Kunda and the corporation alleged the Morses had breached the contract by failing to honor the terms of the agreement and its addendum, and also by failing to pay several outstanding bills of the corporation. The result was damages in the amount of $75,000 for the remaining debt obligation under the agreement, and $10,415 for the outstanding bills of the corporation. Ms. Kunda and the corporation also alleged the Morses converted both corporate and personal property when they removed that property from the store.

After a number of delays, the matter proceeded to a bench trial on July 8 and 9, 2014. At the conclusion of the proceedings, the trial court took the matter under advisement and then issued its opinion on July 17, 2014. The court made several findings of fact in the opinion, including that the Morses had made both the first and second payments of $100,000, and that they were paying approximately $500–$700 monthly for the $75,000 Ms. Kunda agreed to finance. The trial court also did not credit Ms. Kunda's assertion that she retook the property on the basis of a corporate decision. Instead, the court determined the Morses were "muscled out" of the property when Ms. Kunda took back the property well before the expiration of the delinquency period.[3] Moreover, the court additionally found there was no anticipatory breach because the Morses did not inform Ms. Kunda they would not be able to pay the owner financing or principal of the

---

[3] Per the agreement, the Morses would be in default 30 days after the due date of a payment.

4

loan. Ultimately, the court determined Ms. Kunda had prevented the Morses from further performing under the contract when she excluded them well before the June 2010 delinquency period and eleven months before the final settlement date of May 1, 2011.

The trial court denied the claims of Ms. Kunda and the corporation, but it also denied the Morses' claim for non-disclosure of the illegality of the slot machines. Additionally, because the Morses *may* have known that the slot machines were sources of illegal revenue before signing the agreement, the trial court did not declare the contract an illegal agreement. The court, however, did award $200,000 for the initial installments after determining that Ms. Kunda was in material breach of the agreement. It declined to award the Morses their lease payments because those were not intended to apply to the purchase prices under the agreement, and also declined to award the monthly payments for the owner financing on the basis of insufficient evidence. The opinion and judgment were docketed on July 19, 2014.

Ms. Kunda timely noted her appeal on July 31, 2014.

## DISCUSSION

### A. Parties' Contentions

Ms. Kunda claims the trial court erred in two respects in this case. First, she argues that it was the Morses, and not her, who initially breached the agreement. Ms. Kunda contends that the Morses had several opportunities to fulfill the terms of the agreement throughout the life of the contract, but failed. Accordingly, when the Morses notified Ms. Kunda in June 2010 that they would not be able to meet the terms of the agreement, they breached the contract at that time. Moreover, Ms. Kunda contends, even if the Morses

5

were not in default of the agreement, they demonstrated that they were not ready, willing, and able to perform.

In addition to her contract claims, Ms. Kunda argues that the trial court erred in awarding damages of $200,000, which was in excess of the $102,600 that the Morses requested in their pleading.

The Morses counter Ms. Kunda's position and state the evidence presented tended to support that Ms. Kunda initially breached the contract.[4]

## B. Standards of Review

Actions tried without a jury are reviewed under Maryland Rule 8-131(c). We shall review the case both on the law and the evidence. *See* Md. Rule 8-131(c). An appellate court will defer to the trial court's findings of fact, and will not disturb those findings unless they are clearly erroneous. *See State Sec. Check Cashing, Inc. v. Am. Gen. Fin. Servs. (DE)*, 409 Md. 81, 110–11 (2009); *accord Clickner v. Magoth River Ass'n, Inc.*, 424 Md. 253, 266 (2012). The trial court's legal conclusions do not receive the same

---

[4] The Morses additionally argue in their brief that the trial court erred in finding they could not prove their claim for deceit. They urge this Court to reverse the trial court because it failed to draw an adverse inference against Ms. Kunda when she asserted her Fifth Amendment privilege not to testify regarding the legality of the slot machines. This argument, however, is not presented in response to the appellant's contentions regarding Count I of the complaint. It is presented to seek our review of the trial court's denial of Count III of the complaint. As such, it resembles less a counterargument and much more a cross-appeal. Maryland Rule 8-202(e) requires notice of a cross-appeal to be filed "within ten days after the date on which the first notice of appeal was filed or within any longer time otherwise allowed by this Rule." The record does not demonstrate that the Morses filed a notice of a cross-appeal in this case. Accordingly, "if a timely cross-appeal is not filed, we will ordinarily review only those issues properly raised by the appellant[.]" *Maxwell v. Ingerman*, 107 Md. App. 677, 681 (1996). Our review in this matter will be limited to those questions presented by the appellant in her brief, which are limited to a review of Count I of the complaint.

6

deference. *See Banks v. Pusey*, 393 Md. 688, 697 (2006). We will review the trial court's application of law to facts *de novo*. *See id.*; *accord Clickner*, 424 Md. at 266. In an appeal presenting both legal and factual issues, we shall review each issue under the appropriate standard. *See Clickner*, 424 Md. at 266–67.

## C. Analysis

### *i. Breach of Contract*

Sundry arguments notwithstanding, the parties' primary dispute is who was first to breach the contract. Ms. Kunda argues the Morses' purported repeat failures to pay the agreed-upon amounts under the agreement was the initial breach. The Morses, on the other hand, claim Ms. Kunda breached their contract by evicting them prior to the delinquency period.

We are asked, therefore, to determine whether Ms. Kunda or the Morses initially breached the agreement, and whether that breach was material. This is a question of fact that our standard of review, *supra*, compels us to consider with deference the trial court's factual findings.

Generally, a breach of contract is defined as a "failure, without legal excuse, to perform any promise that forms the whole or part of a contract." *Weaver v. ZeniMax Media, Inc.*, 175 Md. App. 16, 51 (2007) (citing 23 Richard A. Lord, *Williston on Contracts* § 63:1 (4th ed., Supp. 2006)). A promise, as referred to in that definition, is "a manifestation of intention to act . . . in a specified way, so made as to justify a promise in understanding that a commitment has been made." *Weaver*, 175 Md. App. at 51 (citing Restatement (2d) of Contracts § 2(1) (1981)). The term "default" is used interchangeably

7

with "breach." *See Nylen v. Geeraert*, 246 Md. 4, 10 (1967) ("When [the term "default" is] used in respect of an obligation created by contract, the ordinary meaning is failure of performance[.]"). When "default" is used with respect to a debt, "it means simply non-payment." *Id.* (citation omitted).

Per the agreement, Ms. Kunda agreed to convey to the Morses the Hacks Point General Store business, 99 of the 100 shares of common stock in the associated corporation, the real estate upon which the business was located, and all of the business' equipment and sales stock. In exchange, the Morses agreed to pay $846,950 for the entire transaction. The parties agreed that the Morses would obtain a bank loan in the amount of $622,000 and that the owner would finance the remaining $224,950.

When it became apparent that the Morses would not be able to obtain bank financing before the initial closing date of October 4, 2007, the parties signed a sale addendum that slightly restructured the transaction. There, the parties agreed to two deposit payments: The first, in the amount of $100,000, would be payable upon the signing of the sale addendum in October 2007, while the second, in the amount of $174,950, would be payable in June 2008. The record is not entirely clear as to whether the parties agreed to amortize the approximately $75,000 that remained after the Morses made the first deposit payment in full and put $100,000 towards the second. Regardless, what is clear is that Ms. Kunda agreed to extend settlement to May 1, 2011, and there were two deposit payments promised, the latter of which may have been subject to financing.

8

Notably, the agreement states that "[The Morses] shall be in default if any payment is not made *within 30 days of the due date*." (emphasis added). Ms. Kunda testified the Morses did not make their required payment on June 1, 2010, and that her attorney stated she had the right to evict the Morses before they were technically in default. Although she did not explicitly state she evicted the Morses because they had not yet remitted the June 2010 installment, that may reasonably be inferred from her testimony.

The challenge for Ms. Kunda, however, is that the initial agreement sets forth the above-mentioned delinquency period during which the Morses could remit payment without defaulting under the contract. The Morses could be considered in default only after the passage of 30 days without payment. Moreover, the addendum to the agreement extended the closing date to May 1, 2011, while stating that "[a]ll terms per the original 'Agreement of Sale' dated September 29, 2007 will remain in effect." According to those original terms, the unpaid principal and interest, which the agreement termed the balloon payment, was due 24 months from the settlement date of May 1, 2011, *i.e.*, May 1, 2013. Entering onto the property and evicting the Morses prior to the expiration of the delinquency period—and well before the balloon payment was actually due—was contrary to the terms of the agreement and, therefore, a breach by Ms. Kunda.

The language of the agreement did not support Ms. Kunda's premature entry onto the property. The original agreement, all terms of which remained valid after execution of the addendum, stated under the "Possession" subsection:

> *If for any reason the Buyer defaults on the purchase of the Corporation scheduled for October 4, 2007, the Buyer* will relinquish all corporate profits to the Seller (and) will provide adequate back-up information (and) *will vacate the premises* (and) all Corporate property and assets will remain with the Corporation in the same working order in which they were on October 1, 2007.

(emphasis added). Reading this term along with the extension of the settlement date per the addendum, we determine the contract did not permit for Ms. Kunda's eviction of the Morses. The closing date was extended to May 1, 2011, meaning that, so long as the Morses continued to make their monthly payments, they were permitted to remain on the premises. Further still, the Morses had not yet defaulted on their June 2010 payment because they were well within the delinquency period. Accordingly, Ms. Kunda breached the terms of the agreement when she entered onto the property before the Morses had in fact defaulted.

For the reasons outlined above, the trial court correctly determined that Ms. Kunda breached the agreement initially.

### ii. Calculation of Economic Damages

Ms. Kunda additionally contends that the trial court erred in awarding the Morses $200,000 in damages. She argues the trial court incorrectly awarded $200,000 in compensatory damages where the Morses prayed for $102,600 in Count I of the complaint. Further complicating matters is that the Morses alleged the damages were for the general store's stock, but, in the record, they indicated the amount was for one of the two down payments they made. Accordingly, Ms. Kunda argues the trial court should not

have awarded $200,000 where the Morses specifically demanded $102,600. The current landscape of the law, however, persuades us that the trial court did not err.

Maryland Rule 2-305 explains the requirements for a valid pleading in the circuit court. Per the Rule, a plaintiff must include in her pleading "a clear statement of the facts necessary to constitute a cause of action and a demand for judgment of the relief sought." Md. Rule 2-305. Notwithstanding other requirements for pleadings under the law, a demand for damages that exceeds $75,000 "shall not specify the amount sought, but shall include a general statement that the amount sought exceeds $75,000." *Id.* The Rule, however, had different requirements before 2012.

Prior to 2012, Rule 2-305 required that "[a] pleading that sets forth a claim for relief . . . shall contain a clear statement of the facts necessary to constitute a cause of action and a demand for judgment for relief sought. *Unless otherwise required by law, a demand for a money judgment shall include the amount sought.*" *Hoang v. Hewitt Ave. Assocs., LLC*, 177 Md. App. 562, 585 (2007) (quoting former Rule 2-305 (1997) (amended 2003)) (emphasis added) (omissions in original). This version of the Rule was an amendment adopted in early 1998. *See Hoang*, 177 Md. App. at 585. It embraced the common law rule that a plaintiff was limited to the damages sought in the *ad damnum* clause of the operative pleading. *See id.* at 587 ("It was implicit in the Maryland common law rule limiting recovery of damages to the amount sought in the operative pleading that the *ad damnum* clause of that pleading set forth the amount of damages being sought; otherwise, it would be impossible to determine whether the amount awarded exceeded the amount requested. The 1998 amendment to Rule 2–305 thus added language stating

11

expressly what already was required implicitly."). Per these pleading requirements, a plaintiff could not state simply that she sought damages "in excess of" a given amount. *Id.* at 588. Such a demand would not give fair notice to a defendant as to the amount being sought. *See id.* (explaining that a concrete figure gives a defendant proper notice of the amount at stake, whereas a demand "in excess of" a certain amount only sets a floor for damages). It was necessary as a matter of fairness, therefore, that a plaintiff demand a specific amount so the defendant was on notice as to how much he would potentially be required to pay.

Under the 1998 Rule, however, a plaintiff who did receive a verdict awarding damages greater than what the *ad damnum* clause demanded could amend that part of her complaint to reflect the actual award. *See Bijou v. Young-Battle*, 185 Md. App. 268, 290 (2009). The plaintiff had to seek this opportunity before the entry of an appealable final judgment, and the amendment was to be accomplished "promptly" after return of the verdict. *Id.* If a plaintiff failed to seek amendment of the *ad damnum* clause, the defendant could seek remittitur of the award so it would conform to the complaint, or the plaintiff would have to release the excess at the appellate level in order to prevent a full reversal of the judgment. *See id.* at 287, 292 (explaining that releasing the excess of an award at the appellate level prevents the judgment from being wholly reversed on appeal, and also that the court erred in failing to grant defendants' motion for remittitur where the plaintiff did not amend the *ad damnum* clause).

The *Hoang* Court noted that, when amendments to Rule 2-305 were being considered in 1998, the Courts of Appeals Standing Committee on Rules of Practice and

Procedure ("Rules Committee") considered a number of possible amendments to the Rule. *See id.* at 584. One proposed amendment was to eliminate the need for *ad damnum* clauses altogether and to require that a plaintiff simply state in her pleading that the jurisdictional amount was met and that she was demanding a money judgment. *See id.* at 584. The Rules Committee decided against that amendment at the time, opting instead for the addition of language indicating that "a demand for a money judgment shall include the amount sought." *Id.* at 584, 587. The *Hoang* Court explained that the amendment ultimately adopted by the Court of Appeals requiring the demand of a concrete figure of damages was consistent with the main purpose of pleading, *i.e.*, fair notice. *See id.* at 583, 587–88 (citing *Scott v. Jenkins*, 345 Md. 21, 27–28 (1997)).

That version of Rule 2-305 prevailed until 2012, when the Rule was again amended. The 2012 amendment to the Rule adopted one of the rejected 1998 proposals and fully eliminated the requirement that a plaintiff plead a specific amount of damages in all instances. *See* Court of Appeals Standing Comm. on Rules of Practice and Procedure, 174th Rep., July 26, 2012, at 217. In addition, it simplified the pleading requirements such that they were tied to a jurisdictional amount of $75,000. *See id*. If the amount demanded was greater than $75,000, only a statement to that effect was necessary; if, however, the amount demanded was less than $75,000, then a specific figure was required because the amount was relevant to the question of circuit court

jurisdiction and the right to a jury trial.[5] *See id.* In proposing its recommended

amendment, the Rules Committee explained that

> [t]he amendment is proposed in light of discussions with attorneys who recommend eliminating the requirement to plead specific amounts in favor of a framework similar to that used in medical malpractice cases. *See* [Md.] Code, Courts [& Jud. Proc.] Article, §3-2A-02(b). It is thought that *ad damnum* clauses are damaging to defendants who become frightened upon receiving complaints with huge amounts specified in the clauses; to plaintiffs who may become disillusioned as to the value of their cases; and to the legal profession because they lead to a negative public perception by distorting the attorney's actual valuation of the case.
>
> The Subcommittee has been advised that defendants and insurance companies do not exclusively rely upon the amount of damages sought in *ad damnum* clauses to determine the value of the case. Insurance companies set aside reserves based upon their own investigation and experience. Defendants and insurance companies obtain information about the actual value of the case during the discovery process.

*Id.* Accordingly, the Rules Committee thought it more appropriate simply to set a

jurisdictional threshold for an *ad damnum*, and to allow the parties to reach a realistic

amount through discovery and investigation. The gross over- or undervaluation of

damages was harmful to the perceptions of parties relative to their cases, and to the

public's perception of the legal profession.

The amendment of Rule 2-305 between the time the complaint was filed in 2010

and the time a judgment was entered in 2014 in favor of the Morses does not significantly

---

[5] The $75,000 threshold was selected because that is the amount necessary for removal to a federal district court on the basis of diversity of citizenship jurisdiction. *See* 28 U.S.C. § 1332 (West 2015); *see also* Rules Committee, 174th Rep., at 216.

14

affect that judgment. Generally, "[c]ourts must apply the law in effect *at the time a case is decided, provided that its application does not affect intervening vested rights*." *Mraz v. Cnty. Comm'rs of Cecil Cnty.*, 291 Md. 81, 90 (1981) (emphasis added) (citations omitted). Parties do not hold vested rights in the procedures used to enforce their substantive rights, meaning that a change in procedural law not affecting substantive rights will apply to "all actions whether accrued, *pending*, or future unless a contrary intention is expressed." *Id.* (emphasis added); *accord Roth v. Dimensions Health Corp.*, 332 Md. 627, 637–38 (1993). Rule 2-305 is the rule governing the pleading requirements for claims to relief in the circuit court—it is a classic procedural rule. The Morses' substantive right to damages for a breach of contract is not affected by the change in the Rule. It only affects how the Morses would have had to request damages and, arguably, it favors them by simplifying the requirements. Moreover, the Court of Appeals, which adopted the 2012 amendment to Rule 2-305, did not express a "contrary intention" to the amendment being applied to "accrued, pending, or future [actions]." *Mraz*, 291 Md. at 90. To the contrary, by Rules Order dated October 4, 2012, the Court of Appeals specifically stated that the amendment "shall take effect and apply to all actions commenced on or after January 1, 2013 and, insofar as practicable, *to all actions then pending*." (Emphasis added).

Although the Morses' right to compensatory damages is unaffected by the change in the Rule, the Morses' *ad damnum* clause in Count I is caught in a procedural purgatory. They pleaded a specific amount of damages per the requirements of the pre-2012 version of Rule 2-305—the $102,600 they paid for the inventory of the general

15

store. The trial court, however, awarded them $200,000, ostensibly for the two $100,000 deposits they made to Ms. Kunda. Were the prior version of Rule 2-305 still in effect, either the Morses would have had to seek leave to amend their complaint in order to conform the *ad damnum* to the trial court's award, or Ms. Kunda would have had to file for remittitur. *See Bijou*, 185 Md. App. at 292. The record demonstrates that neither of those motions were filed after the trial court entered judgment in favor of the Morses for $200,000. Once the judgment became final and appealable, under the pre-2012 Rule, the Morses would have had to release the excess $97,400 in order to save the judgment from complete reversal. *See id.* at 289, 292.

The current version of the Rule, however, presses the reset button on these pre-2012 *ad damnum* requirements. The pleading, as of the date of trial, was not in full compliance with the Rule for obvious reasons. Nevertheless, the complaint *did* plead an amount greater than $75,000, although the amended Rule did not require that the Morses list the reason for the demand (repayment of the amount paid for the store's inventory). In any case, the Rule does not require we vacate the award and remand to the trial court. The Rules Committee did away with the strict pleading requirements for *ad damnum* clauses in order to promote the recovery of realistic awards borne out by investigation and evidence, and to mitigate negative perceptions of the legal profession. The award the Morses received is consistent with the purposes of the current Rule. It was neither an absurdly high nor absurdly low figure and was supported by evidence of the down payments the Morses made to Ms. Kunda. Moreover, the Morses did not seek a grossly

16

overinflated amount of compensatory damages in an effort to strongarm Ms. Kunda into an unjustified settlement.

Because the Morses' substantive rights were not affected by the amendment of Rule 2-305, the present version of the Rule applies to the damages award they received. Nevertheless, because the underlying purpose of the Rule has changed, we hold that Ms. Kunda was not required to seek remittitur, nor were the Morses required to seek leave to amend the *ad damnum* clause or file for a release of the excess award in this Court. The trial court's award is supported by the evidence and factual findings of that court, and, accordingly, the judgment conforms to the purpose of the current version of the Rule. Accordingly, we affirm the judgment of the trial court.

**JUDGMENT OF THE CIRCUIT COURT FOR CECIL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**